JONATHAN WOODNER CO., et al.,
Appellants/Cross–Appellees,

v.

Francisca BREEDEN, et al., Appellees/Cross–Appellants.

Nos. 90–CV–362, 90–CV–541.

District of Columbia Court of Appeals.

Argued March 9, 1995.
Decided Sept. 14, 1995.

---

Walter A. Smith, with whom Stephen G. Vaskov, Robert B. Duncan, Anna E. Blackburne and John J. Dillon, were on brief, Washington, DC, for appellant/cross-appellee Jonathan Woodner Co.

B. Michael Rauh, with whom Martin Shulman and Carroll D. Hauptle, Jr. were on brief, Washington, DC, for appellant/cross-appellee Estate of Jonathan Woodner.

Gregory K. Wells, Landover, for appellant/cross-appellee Laufer.

Roy L. Pearson, Jr., Washington, DC, for appellees/cross-appellants.

Joseph B. Whitebread, Jr., Washington, DC, filed a brief on behalf of Shipley Corporation and the Estate of Ian Woodner as amici curiae in No. 90–CV–541.

Before STEADMAN, FARRELL and KING, Associate Judges.

KING, Associate Judge:

This appeal arises out of an action seeking damages for nuisance and intentional infliction of emotional distress grounded in allegations of poor housing conditions and intimidation by the landlord in attempting to convert the premises from rental to condominium use at Park Tower, an apartment building in Washington, D.C., brought by former tenants ("tenants") against three defendants (all referred to collectively as "management" or "landlord"): the owner of Park Tower, the Jonathan Woodner Company ("Woodner Co."); the estate of the Vice–President of Woodner Co., Jonathan Woodner ("Es-

tate");[1] and Steven Z. Laufer ("Laufer"), who was a partner with Jonathan Woodner in Newpark Towers Associates ("Newpark"), which was formed in July 1979 for the purpose of converting Park Tower into condominiums. The principal dispositive questions presented in this appeal are: (1) whether entitlement to an award of punitive damages requires proof by clear and convincing evidence; (2) whether a punitive damage award can be maintained against the estate of a deceased tortfeasor; and (3) whether, when presenting evidence of an ability to pay punitive damages, proof of current net worth is required to sustain an award.

For the reasons set forth below, we adopt the clear and convincing evidence standard of proof for punitive damages. We also hold that: (1) punitive damages do not survive the death of a tortfeasor; and (2) where a plaintiff seeks to recover punitive damages based on the wealth of the defendant, proof of the defendant's current net worth is required. Finally, we conclude that the evidence was sufficient to support the tenants' claim of intentional infliction of emotional distress, but that the claim of nuisance must be dismissed.[2]

## I.

The present action arises out of a dispute between a number of tenants and the management of the former Park Tower. In 1978, the nearly fifty-year-old Park Tower, located at 2440 Sixteenth Street, N.W. in the District of Columbia, was deteriorating and in need of repair due to its advanced age. Because of the building's condition, Jonathan Woodner and Woodner Co. ceased renting apartments in August 1978 as they became vacant. They also wrote to the remaining tenants acknowledging the deteriorating conditions and informing them of their intent to determine the best way to repair the building and address its numerous problems. In May 1979, a group of tenants formed the Park Tower Tenants' Association ("Tenants' Association") whose goals included "[t]he assurance of perman[en]cy for tenants of Park Tower ... the resumption of previously reduced and/or eliminated services ... [and] the correction of all housing code violations." To achieve these goals, the Association organized a rent strike in which sixteen tenants paid rent into an escrow account rather than to the Woodner Co. On July 26, 1979, Jonathan Woodner and Laufer formed Newpark Towers Associates for the purpose of renovating, developing, managing and marketing Park Tower as a condominium or co-op.

Over the next fourteen months, the Woodner Co. made various relocation offers which were rejected by the striking tenants.[3] The evidence, viewed in the light most favorable to the tenants, showed that, despite Woodner Co.'s assertions that it had done all it could to keep the building in repair during the attempted condominium conversion, manage-

1. Jonathan Woodner died in an airplane crash during the proceedings and the trial court accordingly substituted the Estate of Jonathan Woodner as a defendant.

2. In the cross-appeal, the tenants challenge five separate orders of the trial court, viz: (1) Judge Smith's denial of the tenant's motion to compel certain discovery; (2) an order by Judge Scott, reaffirmed by Judge Webber, continuing the trial court proceedings during the pendency of related matters before the Rental Housing Commission; (3) Judge Wolf's denial of the tenant's motion, made nearly six years after the action was commenced, to amend the complaint to include the Shipley Co. and Jonathan Woodner's father, Ian Woodner, as parties; and (4) & (5) two orders entered by Judge Wolf denying two separate subsequent motions to reconsider his order denying the motion to amend the complaint. Management contends, on various grounds, that none of the orders are properly before us. Those conten-

tions present complicated questions which we need not decide because the cross-appeal can be resolved summarily. For example, the motion for continuance was not opposed by the tenants, and all of the challenged orders are reviewable for an abuse of discretion, which we do not find. *Rosenthal v. National Prods. Co.,* 573 A.2d 365, 374 (D.C.1990) (trial court's resolution of discovery problems "will not be disturbed on appeal unless ... discretion has been abused"); *Hairston v. Gennet,* 501 A.2d 1265, 1268 (D.C.1985) (grant or denial of motion for continuance is within trial court's discretion); *Gordon v. Raven Sys. & Research, Inc.,* 462 A.2d 10, 13 (D.C.1983) (the decision to grant or deny a motion for leave to amend the complaint is "entrusted to the sound discretion of the trial court"). Therefore, the cross-appeal must be affirmed.

3. Some of the members of the Tenant's Association accepted the management's relocation offers and moved to other apartment buildings.

ment continued to allow unsafe and unsanitary conditions to exist, such as: exposed electrical wiring, darkened stairwells, boarded emergency exits, sporadic fires, open vacant apartments, uncapped radiator pipes and gas lines, unsecured entrance and exit doors, missing fire extinguishers, an inoperative fire alarm system, and the presence of urine and feces throughout the building. Also during this period, a group of men, called "workmen" or a "demolition crew" by management, moved into some of the vacant apartments and thereafter engaged in acts which threatened, intimidated, and harassed a number of the tenants. The tenants contend that this harassment was either instigated by management, or done with management's blessing or acquiescence.

On September 19, 1980, thirteen tenants [4] filed the instant action seeking emergency injunctive relief and compensatory and punitive damages for nuisance and intentional infliction of emotional distress. The complaint alleged that over a two-year period, the management interfered with the tenants' "use and enjoyment" of their homes by removing all services and security from the building, and permitting the "demolition crew" to intimidate the tenants. The tenants sought an immediate injunction to: halt the demolition work; repair unsecured open gas lines; bar the presence of non-tenant alcoholics and drug addicts living in the building; and to discontinue other "interference with the plaintiffs' property interests." The tenants claimed they suffered "actual physical damage to [themselves] and their property, a disturbance of [their] peace of mind and a serious threat of future injury, as well as

humiliation, anxiety, and apprehension, all of which was foreseeable and intended by defendants."

Following various discovery delays, stays due to the pendency of related actions, and a mistrial following Jonathan Woodner's death, a four-week jury trial before Judge Sylvia Bacon began on February 22, 1989. The jury returned verdicts in favor of the nine remaining tenants for both nuisance and intentional infliction of emotional distress, awarding the tenants compensatory damages ranging from $30,000 to $50,000 for nuisance, and from $60,000 to $80,000 for intentional infliction of emotional distress, for a total compensatory award of $965,000. Following another week of trial on punitive damages, the jury awarded the tenants collectively a total of $15 million in punitive damages: $9 million against the Woodner Co.; $4.5 million against Laufer; and $1.5 million against the Estate of Jonathan Woodner. Approximately one year later, on March 23, 1990, the trial court denied all post-trial motions, and these appeals followed.

## II.

Management seeks reversal of the jury's verdicts on three broad grounds. First, it contends that the "verdict is fatally tainted" by the tenants' use of race-based peremptory strikes during jury selection and "repeatedly and prejudicially appealing to racial bias before the resulting all-black jury." [5] Second, management maintains that the evidence is insufficient as a matter of law to support either the claim for nuisance or intentional infliction of emotional distress. Third, management challenges the punitive damage

---

4. Only nine of the original thirteen tenants remained in the case by time of trial. Two other tenants settled while this appeal was pending, leaving seven tenant-appellees in this appeal.

5. Judge Bacon rejected management's contentions, that the tenants used race-based peremptory strikes and impermissibly invoked racial bias before the jury, in her Order of March 23, 1990, denying management's motions for judgment notwithstanding the verdict, involuntary dismissal, mistrial or new trial. Because there is record support for the trial judge's findings that the tenants did not use peremptory challenges in a racially discriminatory manner, and that, while race was an issue, the case was presented to the

jury in "a reasonable manner ... and race was not exploited improperly," we will not disturb those findings on this appeal. *See Batson v. Kentucky*, 476 U.S. 79, 100, 106 S.Ct. 1712, 1725, 90 L.Ed.2d 69 (1986) (trial court has discretion to decide if "facts establish, prima facie, purposeful discrimination" in use of peremptory strikes); *Purkett v. Elem*, — U.S. —, —, 115 S.Ct. 1769, 1771, 131 L.Ed.2d 834 (1995) (trial court must "determine[] whether the opponent of the strike has carried burden of proving purposeful discrimination"); *Johnson v. Fairfax Village Condo*, 641 A.2d 495, 501 (D.C.1994) (exercise of discretion will be reversed on appeal only upon clear showing of abuse).

award on a number of grounds set forth below. The Estate also contends that the District of Columbia survival statute precludes a punitive damage award against the estate of a deceased defendant.

## A. Nuisance

 Management claims that the tenants' verdict on their nuisance claim must be reversed as a matter of law. We agree, based on this court's decision in *Bernstein v. Fernandez*, 649 A.2d 1064 (D.C.1991).[6]

In *Bernstein*, a tenant faced with leaking and falling ceilings, rodent and roach infestation, and numerous other necessary repairs which her landlord neglected to correct, sued her landlord for nuisance and intentional infliction of emotional distress. *Id.* at 1066–67. On appeal, this court held that the tenant's nuisance claim did not lie. *Id.* at 1072. First, we held that the condition of the premises (infestation, falling ceilings, etc.) might give rise to an action for breach of the settlement agreement or breach of the warranty of habitability, but "did not amount to nuisance . . . in the legal sense." *Id.* Rather, we said that nuisance, at least in this context, "is not a separate tort in itself but a type of damage . . . [and] the plaintiff must recover, if at all, on the theory of negligence [or some other tort]." *Id.* (citations omitted). Therefore, because nuisance is a type of damage and not a theory of recovery in and of itself, any element of intent in management's actions in this case must be addressed under the intentional infliction of emotional distress claim.

 Second, we held that, because "damages flowing from a nuisance are measured by the diminution of the property's value caused by the nuisance's interference with the enjoyment of the property," and because the tenant had already recovered her full rent as damages under a breach of warranty of habitability claim, her leasehold could not have been further devalued as a result of any "nuisance." *Bernstein,* 649 A.2d at 1073 (citation omitted). Consequently, *Bernstein* would govern the nuisance claim of the tenants in this case to the extent that they seek damages up to the property value. Because, however, the tenants sought and received rent recoupment in an earlier landlord-tenant action based on the same alleged defects underlying their nuisance claim, like the tenant in *Bernstein,* they have already been fully compensated for the diminished value of their leasehold, and "the so-called nuisance could not have further diminished [its] value." *Id.* at 1073. Accordingly, because nuisance here is not a separate tort and because the tenants have already recovered the full amount of such damages, the nuisance claim must be dismissed as a matter of law.

## B. Intentional Infliction of Emotional Distress

 Management also maintains that there was insufficient evidence to establish the claim for intentional infliction of emotional distress. In reviewing the trial court's decision to submit that claim to the jury, "we must view the evidence in the light most favorable to [the tenants], giving [them] the benefit of every rational inference therefrom." *See King v. Kidd,* 640 A.2d 656, 667 (D.C.1993). To establish a claim for intentional infliction of emotional distress, a plain-

---

**6.** *Bernstein* was decided by this court in March 1991, a year after the trial court ruled on the post-trial motions, and was thus not available for the trial court to consider in resolving those motions.

The tenants claim that *Bernstein* should not be retroactively applied to this case. In determining whether a new rule of law will be applied retroactively we examine the extent of the reliance by the parties on the old rule of law. *Mendes v. Johnson,* 389 A.2d 781 (D.C.1978) (en banc). In this case, the tenants point to no clear past precedent on which they have relied, and we are not aware of any authority in this jurisdiction which has upheld a nuisance action against a landlord. In short, this court has never recog- nized nuisance as a cause of action under these circumstances, and we merely stated so in *Bernstein. See Reese v. Wells,* 73 A.2d 899, 902 (D.C. 1950) ("nuisance [is] a field of tort liability, and not a single type of tortious conduct") (internal quotation omitted); *see also District of Columbia v. Fowler,* 497 A.2d 456, 461–62 n. 8 (D.C.1985) ("nuisance . . . is not a separate tort in itself"; moreover, "some 'tortious conduct' is a necessary component of virtually all nuisance claims"). Therefore, because there was no contrary rule of law on which the tenants could have relied, *Bernstein* merely recognizes the existing state of the law which regards nuisance in this context as a type of damage, not as a cause of action.

tiff must prove that the defendant engaged in: (1) extreme and outrageous conduct that (2) intentionally or recklessly caused (3) severe emotional distress to another. *Id.* at 668. In making this claim, management again relies on *Bernstein*, contending that "if the Bernstein landlord's conduct was not sufficiently 'extreme' or 'outrageous' to constitute intentional infliction of emotional distress, clearly the alleged conduct of these defendants cannot be either." Thus, management only challenges the sufficiency of the evidence of the first element of this tort ("extreme and outrageous conduct").[7]

In *Bernstein*, we affirmed the dismissal of the tenant's intentional infliction of emotional distress claim, largely because the landlord's "failure to make effective repairs" was not "so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency." *Bernstein, supra*, 649 A.2d at 1075. Management maintains that the evidence in the instant case is no different from the facts of *Bernstein*. As described above, in *Bernstein*, there were leaking ceilings, dead rats and mice, roaches, gas leaks and rotten bath tiles. In the instant case there were similar deficiencies (*see supra*, discussion at p. 932–933); in fact, the conditions on the premises in this case were arguably much worse than those present in *Bernstein*. Nonetheless, *Bernstein* holds that bad conditions alone are not sufficient to support a claim of intentional infliction of emotional distress. *Id.* at 1075.

However, what sets this case apart from *Bernstein* is the evidence, viewed in the light most favorable to appellees, which established that the tenants were subjected to far more than the deteriorating conditions at Park Tower in the form of management's employment of "workmen" to intimidate the tenants. For example, two witnesses testified that a "Floyd Davis, who was managed by Laufer," was sent by management to the tenants' apartments, with a gun that he repeatedly "accidentally" dropped, in an effort to persuade them to vacate. The evidence also showed that management hired a man named June Burton as the Park Tower "resident manager" to do the "heavy work," which management's agents acknowledged they "really had no choice but to do" to achieve their goals at Park Towers. As two tenants also testified to drug use and a pistol being brandished by this June Burton, the jury could readily infer that the "heavy work" included intimidation. Witnesses also testified to observing Woodner and Laufer personally handing out liquor to the "workmen" who had moved into Park Tower.

The foregoing conduct must be considered in "the specific context in which ... [it] took place, for in determining whether conduct is extreme or outrageous, it should not be considered in a sterile setting." *King, supra*, 640 A.2d at 668 (citation omitted). As this court held in *King*, where a woman brought claims against her supervisor for sexual harassment, and intentional infliction of emotional distress from that conduct, the extreme and outrageous nature of conduct may arise from the position of authority the actor maintains over the other person. *Id.* at 659. Further, the court in *King* held that "a defendant's conduct [is] carefully scrutinized where the defendant is in a peculiar position to harass the plaintiff and cause emotional distress." *Id.*

Management maintained a position of authority over the tenants by virtue of their status as owner and manager, their access to resources, and their ultimate control over the building in which the tenants lived. Consequently, the appellants were in a "peculiar position to harass the plaintiff[s]." *King*, 640 A.2d at 668. Considering management's position, the evidence, viewed in the light most favorable to the tenants, shows that at the very least, the management knew, or should have known, of Davis's and Burton's systematic efforts to harass and intimidate the tenants, and therefore the management could be held to have acquiesced in those activities. The evidence that: (1) Jonathan Woodner and Laufer personally gave liquor to the so-called "workmen"; (2) Jonathan Woodner

---

7. "It is possible to infer the existence of the second element of the tort—intent or recklessness—from the very outrageousness of a defendant's conduct." *King, supra*, 640 A.2d at 668 n. 14 (citing *Sere v. Group Hospitalization, Inc.*, 443 A.2d 33, 38 (D.C.), *cert. denied*, 459 U.S. 912, 103 S.Ct. 221, 74 L.Ed.2d 176 (1982)).

and his father specifically sought out Laufer "because of his experience in dealing with this kind of problem"; and (3) that Laufer advised both Woodners that "one had really no choice but to do a certain amount of heavy work," and that June Burton was the man to do it, was sufficient to permit a jury to find that management actually condoned the harassment of the tenants.

Therefore, considering the context and nature of management's conduct and the prevailing norms of what is acceptable in society for property managers, by condoning or acquiescing in the activities of Burton and Davis, management engaged in what the jury could fairly determine to be "extreme and outrageous" behavior. *See King*, 640 A.2d at 668 (in determining whether conduct is outrageous, court should consider nature of activity, its context, and the prevailing norms of society); *Harris v. Jones*, 281 Md. 560, 380 A.2d 611, 614–15 (1977) (what is considered outrageous varies depending on the context; where "defendant is in a peculiar position to harass the plaintiff and cause emotional distress, his conduct will be carefully scrutinized by the courts"). Because the tenants presented prima facie evidence of management's extreme and outrageous conduct, and management does not challenge the sufficiency of the evidence of the remaining elements of the tort, we hold that the evidence was sufficient for the jury to find that management intentionally inflicted emotional distress upon the tenants. *Id.* 380 A.2d at 615 (jury to determine whether "the conduct has been suffi-

ciently extreme and outrageous to result in liability").

## C. Punitive Damages

■ Management principally argues that the punitive damage awards must be reversed for the following reasons: (1) if either the nuisance or intentional infliction of emotional distress claim cannot be sustained, the entire punitive damage award must fail because the jury awarded a single punitive damage award based on both claims;[8] (2) the jury should have been instructed that clear and convincing evidence was the proper evidentiary standard for determining punitive damages; (3) there is insufficient evidence of appellants' malice;[9] (4) in the case of Jonathan Woodner, a punitive damage award does not survive his death and (5) in the case of Woodner Co. and Laufer, the punitive damage award is unsupported by the evidence.[10]

### 1. Clear and Convincing Evidence

■ In its motions for directed verdict, each defendant urged the trial court to apply a clear and convincing evidence standard to the determination whether punitive damages should be awarded. The tenants objected and the court denied the request, and instead applied the preponderance of evidence standard. Later Laufer presented a proposed jury instruction that included the clear and convincing evidence[11] standard but, over the

---

**8.** *See, e.g., Nimetz v. Cappadona*, 596 A.2d 603, 608 (D.C.1991) (party who opposed special verdict form, which would have clearly shown basis for jury's verdict, waives claim on appeal); *see also Franklin Inv. Co. v. Smith*, 383 A.2d 355, 358 (D.C.1978) (punitive damages may not be awarded where there is no basis for compensatory damages). We do not need to reach this issue because we hold, *infra*, the punitive damage awards cannot stand for other reasons.

**9.** Using the preponderance of evidence standard, this claim is resolved in the tenants' favor essentially for the reasons we relied upon in holding that the evidence was sufficient to sustain the claim of intentional infliction of emotional distress.

**10.** Because we hold that the appellees' punitive damage award must be reversed for the reasons stated, we do not need to consider management's contention that the punitive damage awards

were so excessive so as to violate due process. Management also attacks the punitive damage awards on the ground that the tenants improperly presented evidence and argument regarding its own costs of litigation and the duration of the litigation, and that the trial court employed inadequate procedural safeguards to ensure the fairness of the award. Because we reverse the punitive damage awards, we will not consider those issues. On remand, the trial court is free to address them anew.

**11.** The proposed jury instructions included a "clear, convincing, and unequivocal" standard. The tenants argue that by including the term "unequivocal" management has not preserved the issue of its entitlement to a "clear and convincing" instruction in this court. We reject that argument because management unambiguously asserted the clear and convincing standard in its arguments for directed verdict and during the

tenants' objection, the court rejected that proposal and instructed the jury that the preponderance of the evidence standard applied to the determination of both entitlement to and the amount of punitive damages. In this court, management renews the request it made to the trial court, asking that we adopt the clear and convincing evidence standard.

Earlier this year in *Dyer v. Bergman & Assoc.,* 657 A.2d 1132 (D.C.1995), we observed:

> This court has never specifically determined whether the facts on which a plaintiff's claim for punitive damages is based must be proved by a preponderance of the evidence—the conventional civil standard—or by a more exacting measure of proof.... Because punitive damages are, at least from the defendant's perspective, generally in the nature of a fine, it may well be appropriate to require proof by clear and convincing evidence of the commission of the tort and of the outrageousness of the conduct.

*Id.* at 1139 (internal citations omitted).[12] We did not decide the issue in *Dyer* because it had not been preserved in the trial court. That is clearly not the case here. We are persuaded by the growing majority of jurisdictions deciding the issue that we should adopt the requirement that proof by clear and convincing evidence must be shown in order to receive an award of punitive damages.

We begin with the Supreme Court's recent observation that there is much to be said for requiring a clear and convincing, or even a reasonable doubt standard,[13] for the award of punitive damages. *Pacific Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1, 23 n. 11, 111 S.Ct. 1032, 1046 n. 11, 113 L.Ed.2d 1 (1991). One year after *Haslip,* the Maryland Court of Appeals held that the "[u]se of a clear and convincing standard of proof will help insure that the punitive damages are properly awarded." *Owens–Illinois v. Zenobia,* 325 Md. 420, 601 A.2d 633, 657 (1992). The Maryland court reasoned that punitive damages are penal in nature and therefore a more exacting standard, such as one that Maryland imposes, as we do,[14] in fraud and attorney disciplinary cases, should be applied. *Id.* 601 A.2d at 656. In reaching that conclusion, the Maryland court found particular support in the decisions of the courts of Hawaii, Arizona, and Maine. *See Masaki v. General Motors Corp.,* 71 Haw. 1, 780 P.2d 566 (1989); *Tuttle v. Raymond,* 494 A.2d 1353 (Me.1985); *Linthicum v. Nationwide Life Ins. Co.,* 150 Ariz. 326, 723 P.2d 675 (1986).

For example, the Maryland court cited with approval the reasons given in *Masaki* for adopting the clear and convincing evidence standard. Specifically, the *Masaki* court observed:

> [P]unitive damages are a form of punishment and can stigmatize the defendant in much the same way as a criminal conviction. It is because of the penal character of punitive damages that a standard of proof more akin to that required in criminal trials is appropriate.... A more

---

discussion of the jury instruction. It is clear that the trial court rejected any standard more exacting than preponderance of the evidence, and inclusion of "unequivocal" in the proposed jury instruction played no role in the trial court's reasoning.

**12.** In making this observation, the *Dyer* court cited two cases from this jurisdiction which generally discuss this issue, without firmly holding that a particular standard of care is required. *See Darrin v. Capital Transit Co.,* 90 A.2d 823, 825 (D.C.1952) (for an award of punitive damages, "something more than ordinary negligence [must be shown]; it must be reckless and of a criminal nature and clearly established"); *De Foe v. Potomac Elec. Power Co.,* 123 A.2d 920, 922 (D.C.1956) ("As a predicate for awarding

exemplary damages against a corporation ... it must be found that the acts ... were unlawful, partaking somewhat of a criminal or wanton nature, and that they were characterized by willfulness, wantonness and malice and such conduct must be clearly established.")

**13.** By statute Colorado requires proof beyond a reasonable doubt. COLO.REV.STAT. § 13–25–127(2) (1989).

**14.** *See In re Lenoir,* 585 A.2d 771, 784 (D.C.1991) (in attorney disciplinary cases, "Bar Counsel is obliged to prove, by clear and convincing evidence, that a violation of a disciplinary rule has occurred"); *Park v. Sandwich Chef, Inc.,* 651 A.2d 798, 802 n. 3 (D.C.1994) (fraud must be proven by clear and convincing evidence).

stringent standard of proof will assure that punitive damages are properly awarded. *Masaki, supra,* 780 P.2d at 575.

Similarly, the Supreme Judicial Court of Maine, observing that "although punitive damages serve an important function in our legal system, they can be onerous when loosely assessed," concluded:

> The potential consequences of a punitive damages claim warrant a requirement that the plaintiff present proof greater than a mere preponderance of the evidence. Therefore, we hold that a plaintiff may recover exemplary damages based on tortious conduct only if he can prove by clear and convincing evidence that the defendant acted with malice.

*Tuttle,* 494 A.2d at 1363. Finally, the Arizona court concluded:

> As this remedy is only to be awarded in the most egregious of cases, where there is reprehensible conduct combined with an evil motive over and above that required for the commission of a tort, we believe it appropriate to impose a more stringent standard of proof.

*Linthicum, supra,* 723 P.2d at 681. Other jurisdictions considering the issue have also required the clear and convincing standard for an award of punitive damages. *See, e.g., Chizmar v. Mackie,* 896 P.2d 196, 210 (Alaska 1995); *Boling v. Tennessee State Bank,* 890 S.W.2d 32, 33 (Tenn.1994); *Travelers Indem. Co. v. Armstrong,* 442 N.E.2d 349, 362–63 (Ind.1982); *Wangen v. Ford Motor Co.,* 97 Wis.2d 260, 294 N.W.2d 437, 458 (1980).

We have always recognized that punitive damages are a form of punishment, *Arthur Young & Co. v. Sutherland,* 631 A.2d 354, 372 (D.C.1993). We have also observed that "[p]unitive damages are warranted only when the defendant commits a tortious act accompanied with fraud, ill will, recklessness, wantonness, oppressiveness, wilful disregard of the plaintiff's right, or other circumstances tending to aggravate the injury." *Washington Medical Ctr. v. Holle,* 573 A.2d 1269, 1284 (D.C.1990) (citations and internal quotation omitted). Therefore, for these reasons and for the reasons expressed by the authorities cited above, we hold that in order to sustain an award of punitive damages, the plaintiff must prove, by a preponderance of the evidence, that the defendant committed a tortious act, and by clear and convincing evidence that the act was accompanied by conduct and a state of mind evincing malice or its equivalent. *Masaki, supra,* 780 P.2d at 575 ("plaintiff must prove by clear and convincing evidence that defendant has acted wantonly or oppressively or with ... malice...."); *Tuttle, supra,* 494 A.2d at 1363 ("plaintiff may recover exemplary damages based upon tortious conduct only if he has proven by clear and convincing evidence that the defendant acted with malice"); *Linthicum, supra,* 723 P.2d at 681 (same; following *Tuttle* ). In short, the jury must be instructed that punitive damages may be awarded only if it is shown by clear and convincing evidence that the tort committed by the defendant was aggravated by egregious conduct and a state of mind that justifies punitive damages.

### 2. *Estate of Woodner*

■ The Estate maintains that the trial court erred in permitting punitive damages to be awarded against the estate of Jonathan Woodner. While this is an issue of first impression for this court, the issue need not detain us long because we are persuaded by the overwhelming weight of authority, that punitive damages may not be awarded against the estate of a deceased defendant.

■ We first look to the survival statute for guidance. At common law, all personal causes of action against a deceased person died with that person. *Greater Southeast Community Hosp. v. Williams,* 482 A.2d 394, 396–97 (D.C.1984). The District of Columbia modified this common law rule by enacting the "Survival Statute" codified as D.C.Code § 12–101 which provides:

> On the death of a person in whose favor or against whom a right of action has accrued for any cause prior to his death, the right of action, for all such cases, survives in favor of or against the legal representative of the deceased.

Although preserving certain causes of action after death, the statute says nothing about

whether an award of punitive damages against the estate survives. We therefore must look for other evidence of legislative intent. An examination of the history of the survival statute and the amendments to it reveals that the imposition of punitive damages against the estate of a deceased defendant was never authorized or envisioned.[15] Rather, until the 1978 amendment, the survival statute only preserved various *causes of action* following one's death; damages, of course, are not a cause of action, but a form of relief and punishment. *See, e.g., Bernstein, supra,* 649 A.2d at 1072–73; *see also Gibbs v. Investigators of D.C. Inc.,* 105 Daily Wash.L.Rptr. 1, 3, (D.C.Super.Ct. January 3, 1977); *Goodacre v. Shulmier,* 64 App.D.C. 10, 73 F.2d 519 (1934). Finally, as a statute in derogation of the common law, the survival statute must be narrowly construed. *Saunders v. First Nat'l Realty Corp.,* 245 A.2d 836, 838 (D.C.1968).

In the District of Columbia, the "basic purposes" of punitive damages are punishment and deterrence. *Robinson v. Sarisky,* 535 A.2d 901, 907 (D.C.1988). In permitting the punitive damage award to stand against the estate, the trial court reasoned that the purpose of punitive damage awards in the District of Columbia is "punish the tortfeasor *and* to deter [the tortfeasor and] others from engaging in similar conduct" (emphasis in original). The Estate convincingly argues,

however, that the primary purpose of punitive damages is to punish and deter the tortfeasor, and that deterrence of others is secondary. *See, e.g., id.* (identifying deterrence and punishment as purposes of punitive damages without mentioning deterrence of others as additional goal).

The theory of justice which punishes a wrongdoer for his or her acts while avoiding punishment of innocent parties has persuaded courts and legislatures in nearly every jurisdiction deciding the issue to disallow punitive damages against estates.[16] For example, in *Lohr v. Byrd,* 522 So.2d 845 (Fla. 1988), the Supreme Court of Florida held that punitive damages may not be imposed upon the "innocent heirs or creditors of a decedent's estate" because to do so would unduly punish the decedent's widow and children and creditors. The court reasoned:

> If deterrence is justified in this instance, it would also be justified to require a decedent's family to pay a fine or be imprisoned for the decedent's criminal conduct. With the wrongdoer dead, there is no one to punish, and to punish the innocent ignores our basic philosophy of justice.

*Id.* at 847. In *Crooker v. United States* 325 F.2d 318, 321 (8th Cir.1963) the Eighth Circuit echoed similar public policy concerns when it noted that the purpose of criminal

**15.** *See, e.g.,* Report of the Council of the District of Columbia's Committee on the Judiciary, "Bill 2–52, The District of Columbia General Survival of Tort Actions Act" (March 8, 1978) (summarizing history of legislative changes in our survival statute):

The District of Columbia survival statute is the result of three successive Congressional enactments. The first District survival statute, section 235 of chapter 854 of the Act of March 3, 1901 (An Act to Establish a Code of Law for the District of Columbia, 31 Stat. 1227), removed the common law barrier to the survival of personal actions. The second, section 1 of chapter 508 of the Act of June 19th, 1948 (Public law 80–677, 62 Stat. 487) broadened the language of the survival statute to apply to "any cause of action" and excluded damages for pain and suffering from recovery in tort actions. The third statutory change, the Act of December 12, 1963 (Public Law 88–241, 77 Stat. 509), which recodified all of Title 12 of the District of Columbia Code, was aimed simply at clarifying the statutory language.

The 1978 amendment, which was accompanied by the above-cited report, reflected a legislative

intent to permit recovery for pain and suffering in survival actions. *See Graves v. United States,* 517 F.Supp. 95 (D.D.C.1981).

**16.** Of the states that have ruled on the issue, twenty-eight follow the rule that punitive damages do not survive the death of the tortfeasor. Only four states have taken the contrary position and do so on grounds not applicable in the District of Columbia. *See Hofer v. Lavender,* 679 S.W.2d 470 (Tex.1984) (punitive damages also serve as reimbursement "for losses too remote to be considered as elements of strict compensation"); *Perry v. Melton,* 171 W.Va. 397, 299 S.E.2d 8, 13 (1982) (punitive damages serve added function of "providing additional compensation"); *Munson v. Raudonis,* 118 N.H. 474, 387 A.2d 1174, 1177 (1978) (same); *Ellis v. Zuck,* 546 F.2d 643 (5th Cir.1977) (in applying Alabama law, Court held because punitive damages are recoverable under Alabama Wrongful Death Act, such damages are also recoverable under the Survival Statute).

fines is to punish the defendant for his offense, but that "there is no justice in punishing his family for his offense." *Id.* Finally, the Supreme Court of Alaska elected to adhere to the judicial philosophy which seeks to punish the wrongdoer and not the innocent in determining to:

> follow the better reasoned decision and hold that an injured party may not recover punitive damages from the estate of a deceased tortfeasor ... [because t]he central purpose of punitive damages is to punish the wrongdoer and deter him from future misconduct.... Since the deceased tortfeasor cannot be punished, the general deterrent effect becomes speculative at best, and this, in our view, falls short of furnishing a justifiable ground for an award of punitive damages against the tortfeasor's estate.

*Doe v. Colligan,* 753 P.2d 144, 146.[17]

For all the foregoing reasons, we hold that our system of liability for wrongful acts is best served by not allowing awards of punitive damages against a tortfeasor's estate.

### 3. Sufficiency of Evidence for Punitive Damages Against Woodner Co. & Laufer

Woodner Co. and Laufer maintain that the punitive damage award is unsupported by the evidence because the tenants failed to prove Woodner Co.'s and Laufer's net worth, and therefore the punitive damage award must be set aside. We agree and therefore hold that a plaintiff seeking to recover punitive damages based upon the wealth of the defendant, as the tenants did here, must establish the defendant's net worth at the time of trial. We also hold that, while the tenants presented barely sufficient evidence to permit the jury to award some punitive damages based upon the defendants' ability to pay, that evidence fell gravely short of supporting the very sizeable punitive damage awards in this case. For these reasons, the issue of punitive damages must be retried.

*Cf. Finkelstein v. District of Columbia,* 593 A.2d 591 (D.C.1991) (en banc). We will consider each holding in turn.

First, management contends that punitive damages based on the wealth of the defendants requires proof of a defendant's current net worth (*i.e.,* at the time of trial). The standard jury instructions in this jurisdiction, and the jury instructions given in this case, support that contention.[18] The trial court instructed the jury:

> [N]et worth ... is an indicia of the appropriate amount of punitive damages because it is a measure of the current wealth or the current financial situation of a defendant.... [N]et worth [is used] to measure current wealth because it gives an accurate measure of ability to pay. Earnings and/or assets alone as distinguished from net worth do not necessarily show ability to pay. You are also cautioned that earnings or assets in past years do not necessarily show ability to pay.... You consider all of the circumstances, consider net worth, assets, minus liability unless you find a concealment or a diversion which justifies consideration of the assets in determining what amount will punish, but not financially ruin the defendant....

> However, in order to award punitive damages against any defendant, you must find that the defendant has a financial ability to pay an award of punitive damages. Evidence of this is in the form of net worth. That is assets which exceed liability. If you are unable to determine a defendant's net worth because of a lack of evidence presented by plaintiffs or if you are not able to otherwise determine financial ability to pay punitive damages without speculating or if you find that a defendant is unable to pay punitive damages because that defendant has a negative or a zero net worth, then the amount of punitive damages would be [zero].

---

17. The restatement second of torts also takes the same position, stating that "the death of the tortfeasor terminates liability for punitive damages." Restatement (Second), Torts § 926(b) (1979).

18. The tenants did not object to these instructions in the trial court, on any grounds applicable here, and do not challenge them in this appeal.

The trial judge also expressly instructed the jury that the burden of proving net worth was on the plaintiff. Consequently, in making its punitive damage award, the jury was clearly instructed to focus upon the net worth of the defendants.

■ Because the purpose of punitive damages is to punish a tortfeasor and deter future conduct, the amount of such damages should be enough to inflict punishment, while not so great as to exceed the boundaries of punishment and lead to bankruptcy. *See Arthur Young & Co., supra,* 631 A.2d at 372 ("purpose of punitive damages is to punish a person for outrageous conduct") (internal citation omitted); *Robinson v. Sarisky,* 535 A.2d 901, 906 (D.C.1988) (same); *see also Wynn Oil Co. v. Purolator Chem. Corp.,* 403 F.Supp. 226, 232 (M.D.Fla.1974) ("purpose of punitive damages is to punish defendants and serve as a deterrent ... the award of punitive damages should only hurt but not bankrupt a defendant"). Therefore, since current net worth fairly depicts a tortfeasor's ability to pay punitive damages, the plaintiffs here were required to present sufficient proof of current net worth to support the punitive damages awarded by the jury.[19] *See, e.g., Snow v. Capitol Terrace, Inc.,* 602 A.2d 121, 127 n. 8 (D.C.1992) (question of punitive damages was not permitted to go to jury because,

in addition to other reasons, "the [trial] judge found insufficient evidence of [defendant's] net worth"). *See also Dumas v. Stocker,* 213 Cal.App.3d 1262, 262 Cal.Rptr. 311, 315 (4th Dist.1989) ("We conclude that the absence of any evidence of [defendant's] net worth renders the amount of the award unsupported by the evidence"); *Welty v. Heggy,* 145 Wis.2d 828, 429 N.W.2d 546, 549 (Ct.App. 1988) (any measure of net worth other than the difference between the value of the assets and liabilities of the defendants at a time reasonably close to the date of trial is "illusory").

■ Second, the Woodner Co. and Laufer both contend[20] that the tenants failed to meet their burden of establishing their net worth, or at least sufficient net worth to support the verdicts reached by the jury. In the opening statement on punitive damages, tenants' counsel stated that the Woodner Co. was worth "in excess of a hundred million dollars" and that "the primary factor" for the jury to consider was evidence of "the assets of" the Company. Over objection, the tenants presented five exhibits: a draft of a loan application prepared by Woodner Co. three years prior to the trial; a real estate development proposal developed eight years prior to the trial; a 1979 projection of the potential value of Park Tower if the Company incurred

**19.** Neither party objected to the inclusion in the instructions of net worth *as a relevant consideration* in the circumstances here. Although, as we here hold, proof of net worth is required where a plaintiff invokes the defendant's wealth, net worth is only one of several considerations relevant to a punitive damages determination. *See Bankers Multiple Ins. v. Farish,* 464 So.2d 530, 533 (Fla.1985) ("We did not intend to abandon the required relationship between the amount of punishment and the nature, extent, and enormity of the wrong and all of the circumstances in relation to the tort. The net worth of a defendant is one factor to be considered, but so are the circumstances and the degree of wantonness or culpability."); 87 A.L.R. 4th 141 § 2(a). "Punitive Damages: Relationship to Defendant's Wealth as Factor in Determining Propriety of Award" ("[W]ealth is certainly not the only factor or even the determinative factor in arriving at the correct amount. Awards which might otherwise be appropriate in relation to the defendant's wealth have been held inappropriately excessive in light of other circumstances ...").

The instruction here given without objection read in part:

In the District of Columbia, there are four factors that we often discuss in determining the amount of punitive damages. These are described as the net worth of a defendant, the nature of the wrong committed, the state of mind of the defendant and attorneys fees that a plaintiff has incurred in the instant case. A jury may also consider the duration of the litigation and the profitability of a defendant's misconduct.

See also STANDARDIZED CIVIL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 16–3 (1981).

Nor have appellants challenged on appeal the trial judge's decision to simply bifurcate the compensatory and punitive damages portions of the trial.

**20.** The Estate of Jonathan Woodner also makes this argument; however, because we hold that the punitive damage award cannot be maintained against the Estate, we do not need to address the question of whether the tenants established the net worth of Jonathan Woodner's estate.

the expense of successfully developing the building into condominiums; and two excerpts from the testimony of Jonathan Woodner in other proceedings two years earlier in which he identified the limited properties owned by the Company as of 1980. The Woodner Co. presented testimony that it owned only two properties at the time of trial, and that it managed but did not own most of the rental properties it had developed and maintained in the District.

The only evidence presented by the tenants to establish Laufer's net worth, which was admitted over Laufer's objection, were two of Laufer's financial statements, which were five and seven years old, to "prove his ability to generate income."[21] Laufer testified that, although the two financial statements accurately reflected his financial circumstances in the two years reported, he had recently suffered substantial financial reverses such that his net worth at the time of trial was in the negative.

We agree with management's contention that none of the exhibits presented by the tenants established the net worth of the Woodner Co. at all, much less at the time of trial. Similarly, although the exhibits presented against Laufer showed net worth, the information was not current. *See, e.g., Welty, supra,* 429 N.W.2d at 549 (measure of net worth is difference between value of assets and liabilities at time close to trial); *Fopay v. Noveroske,* 31 Ill.App.3d 182, 334 N.E.2d 79, 94 (1975) (desired financial evidence to show tortfeasor's ability to pay is current net worth); *Dumas, supra,* 262 Cal.Rptr. at 316 (rejected requiring the defendant to "affirmatively ... prove its penurious financial condition as a precondition to any appellate challenge to the excessiveness of the award"). The most that can be said of the evidence presented was that it was not unreasonable for the jury to infer that at the time of trial,

both Woodner Co. and Laufer had some resources available to them to support a nominal punitive damage award, but there was no factual basis for the sizable awards actually made.

As in *Dumas,* this record includes various kinds of financial information, none of which firmly established the Woodner Co.'s or Laufer's net worth at the time of trial. For example, in *Dumas,* the plaintiff introduced evidence of a net gain on the sale of the subject property; the fact that the defendant owned, in prior years, between two and fifteen apartment buildings, without any evidence of any equity interest; and evidence that defendant filed "fictitious" business name statements, without any evidence of his income or equity interest in these businesses. *Dumas,* 262 Cal.Rptr. at 315. Despite that evidence, the *Dumas* court held "there was no evidence of [the plaintiff's] net worth at the time of trial," which is the proper measure of net worth, and that "the absence of any evidence of net worth renders the amount of the [punitive damage] award unsupported by the evidence." *Id.* The case was remanded to the trial court for a "redetermination based on evidence of defendant's net worth...." *Id.* 262 Cal.Rptr. at 317. The evidence presented here is similar to that presented in *Dumas;* however, we conclude that the tenants' evidence was sufficient to show some current ability of Woodner Co. and Laufer to pay, but that the damages awarded were far in excess of any proof of current net worth.[22]

Finally, we think that a ruling by the trial judge, shortly after the trial, convincingly shows that the punitive damage verdicts reached did not properly take into account the net worth of either the Woodner Co. or Laufer. After the punitive damage verdicts were entered the defendants promptly moved

**21.** Laufer's 1982 and 1985 financial statements showed a net worth of $11.2 million and $19.8 million, respectively.

**22.** The only evidence in this record relating to Woodner Co.'s net worth shows that the punitive damage award was six times Woodner Co.'s net worth. Specifically, we note that after filing its notice of appeal, Woodner Co. requested a stay of the enforcement of the judgment pending appeal. The trial court appointed a Special Master to ascertain the net worth of the Woodner Co. to guide it in setting an appropriate bond. The finding of the Special Master, which was adopted by the trial court, was that the net worth of Woodner Co. as of May, 1990, one year after trial, was $1,500,000. In contrast, the punitive damage award against Woodner Co. was $9,000,-000.

to stay the judgments pending the filing of post-trial motions. On May 15, 1989, in a written order, the trial judge granted the motions to stay, finding that if the Woodner Co. were required to pay the punitive damage award of $9 million and the $950,000 in compensatory damages for which it was jointly and severally liable, then the Company's "liability will far exceed its assets and it appears that the Company would proceed to bankruptcy." With respect to Laufer, the trial judge observed that satisfying the judgment "would require all of [Laufer's] assets and more. Attachment of his assets would deprive him of all his working capital." In short, the trial judge ruled, less than a month after the trial, that payment of the judgments[23] by Woodner Co. and Laufer would essentially bankrupt them. As the Maryland Court of Special Appeals recently observed: "when a punitive damage award consumes a defendant's total [net worth], it ceases to serve the societal goal of punishment" and cannot stand. *Fraidin v. Weitzman*, 93 Md. App. 168, 611 A.2d 1046, 1068 (1992). The same can be said with respect to the punitive damage awards made by the jury here.

### III.

We therefore reverse the judgment entered on the nuisance claim, reverse all awards of punitive damages, and affirm the cross-appeal. The judgment for compensatory damages for intentional infliction of emotional distress is affirmed. We remand to the trial court for further proceedings consistent with this opinion.

*Affirmed in part.*

*Reversed in part.*

---

**23.** Over 90% of the total judgment against Woodner Co. was for punitive damages ($9 million in punitive damages and $965,000 for compensatory damages), and over 80% of the total judgment against Laufer was for punitive damages ($4.5 million in punitive damages and $965,000 in compensatory damages).