Briggitta HARDIN, Plaintiff,

v.

Mick DADLANI, Individually and in his capacity as Redline Owner and Manager, and

Redline DC, LLC, Defendants.

Civil Action No. 11–cv–02052 (RBW)

United States District Court, District of Columbia.

Signed October 17, 2016

Filed November 1, 2016

Dennis A. Corkery, Matthew K. Handley, Washington Lawyers' Committee for Civil Rights & Urban Affairs, Jennifer I. Klar, Jia M. Cobb, Megan Cacace, Relman, Dane & Colfax, PLLC, Washington, DC, for Plaintiff.

Claude–Eric Keller Nicolas, Sundeep Hora, Leslie David Alderman, III, Alder-

man, Devorsetz & Hora PLLC, Courtney R. Abbott, Gordon Rees Scully Mansukhani LLP, Jonathan Wolfe Greenbaum, Lloyd Liu, Coburn & Greenbaum, PLLC, Angela D. Hart–Edwards, Shameka N. Bloyce, Gordon & Rees, LLP, Washington, DC, Gregory Paul Johnson, Offit Kurman, P.A., Bethesda, MD, for Defendants.

## MEMORANDUM OPINION

REGGIE B. WALTON, United States District Judge

On January 29, 2016, the plaintiff, Briggitta Hardin, received a favorable jury verdict against the defendants, Mick Dadlani ("Dadlani") and Redline DC, LLC ("Redline"), including damages totaling $687,000.00. Judgment in a Civil Action ("Judgment"), ECF No. 176. Before the Court are the Defendants' Renewed Motion for Judgment as a Matter of Law Pursuant to Rule 50(b) ("Defs.' Judgment Mot."),[1] the defendants' Motion for a New Trial Pursuant to Rule 59(a) ("Defs.' New Trial Mot."),[2] and the defendants' Motion, in the Alternative, for Remittitur Pursuant to Rule 59(e) ("Defs.' Remittitur Mot."). For the reasons set forth below, the Court concludes that it must deny each of the defendants' motions.[3]

## I. The Defendants' Renewed Motion for Judgment as a Matter of Law

The defendants contend that the "[p]laintiff failed to satisfy her burden of

1. While the defendants filed a memorandum and a number of exhibits in support of this motion, the Court notes that the defendants did not actually file a motion seeking the relief.

2. The defendants' motion for judgment as a matter of law and motion for a new trial posit a litany of arguments that were previously addressed by the Court or are otherwise clearly meritless based upon the Court's prior rulings. These filings fail to offer any new authority or reasoning pertinent to those issues, and take positions far beyond what may be considered zealous advocacy. In that regard, they unnecessarily impose tremendous litigation costs on the opposing party who has to respond to them and require the Court to expend its limited resources on their resolution. The Court has already sanctioned the defendants' attorneys once previously in this case. While those attorneys have since been discharged as the legal representatives of the defendants, better is demanded of them in the future if they continue to practice as members of the bar of this Court.

3. In addition to the filings already referenced, the Court considered the following submissions in reaching its decision: (1) the Defendants' Corrected Memorandum of Points and Authorities in Support of [the] Defendants' Renewed Motion for Judgment as a Matter of Law Pursuant to Rule 50(b) ("Defs.' Judgment Mem."); (2) the defendants' Corrected Statement of Material Facts Not in Genuine Dispute in Support of Defendants['] Motion for Judgment as a Matter of Law and Motion for a New Trial ("Defs.' Corrected Facts"); (3) the Plaintiff's Opposition to [the] Defendants' Renewed Motion for Judgment as a Matter of Law Pursuant to Rule 50(b) ("Pl.'s Judgment Opp'n"); (4) the Plaintiff's Response to [the] Defendants' Corrected Statement of Material Facts Not in Genuine Dispute in Support of [the] Defendants['] Motion for Judgment as a Matter of Law and Motion for a New Trial ("Pl.'s Facts"); (5) the defendants' Reply to [the] Plaintiff's Opposition to [the] Defendants' Renewed Motion for Judgment as a Matter of Law Pursuant to Rule 50(b) ("Defs.' Judgment Reply"); (6) the Defendants' Reply to [the] Plaintiff's Response to Statement of Material Facts Not in Genuine Dispute in Support of [the] Defendants['] Motion for Judgment as a Matter of Law and Motion for a New Trial ("Defs.' Reply Facts"); (7) the defendants' Memorandum of Points and Authorities in Support of [the] Defendants' Motion for a New Trial Pursuant to Rule 59(a) ("Defs.' New Trial Mem."); (8) the Plaintiff's Opposition to [the] Defendants' Motion for a New Trial Pursuant to Rule 59(a) ("Pl.'s New Trial Opp'n"); (9) the defendants' Reply to [the] Plaintiff's Opposition to [the] Defendants' Renewed Motion for Judgment as a Matter of Law Pursuant to Rule 59(a) [erroneously mislabeled and responding to the plaintiff's opposition to the defendants' mo-

proof to demonstrate that she was terminated because of discrimination based on her race and to show that [ ] Dadlani or Redline had the requisite mental state to support an award of punitive damages." Defs.' Judgment Mem. at 1. The defendants therefore argue that they are "entitled to judgment as a matter of law on [the] [p]laintiff's state and federal race discrimination claims," id., and are also "entitled to judgment as a matter of law on the punitive damages award," id. at 2.

■ At the conclusion of a jury trial, a court may grant a motion for judgment as a matter of law pursuant to Rule 50 of the Federal Rules of Civil Procedure only if it finds that "a reasonable jury would not have had a legally sufficient evidentiary basis to find for the party on that issue." Huthnance v. District of Columbia, 793 F.Supp.2d 183, 196 (D.D.C. 2011) (quoting Fed. R. Civ. P. 50(a)(1)). Evaluating a motion filed under this Rule "mirror[s]" the standard courts employ when considering a motion for summary judgment, "such that 'the inquiry under each is the same.'" Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). When considering a motion for judgment as a matter of law, a court "should review all of the evidence in the record[,]" but it "must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Id. Even though a "court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe[,]" meaning that "the court

should give credence . . . [to] that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that the evidence comes from disinterested witnesses." Huthnance, 793 F.Supp.2d at 197 (quoting Reeves, 530 U.S. at 151, 120 S.Ct. 2097). Judgment as a matter of law is "highly disfavored" because it "intrudes upon the rightful province of the jury." Boodoo v. Cary, 21 F.3d 1157, 1161 (D.C. Cir. 1994). Accordingly, a "court should grant the motion only when 'the non-movant's evidence is so insufficient that a reasonable finder of fact could not possibly find for the non-movant.'" Hancock v. Wash. Hosp. Ctr., 13 F.Supp.3d 1, 4 (D.D.C. 2014) (quoting Halcomb v. Woods, 767 F.Supp.2d 123, 134 (D.D.C. 2011)).

### A. The Judgment as a Matter of Law with Respect to Liability

■ The volume of evidence presented during the trial in this case was more than sufficient for a jury to find the defendants liable for the misconduct asserted by the plaintiff. When asked about Dadlani's preferred composition of wait staff at Redline, former Redline manager Jeremy Gifford testified that Dadlani stated that he "didn't want it to be an African American staff" and that he "often" expressly stated a specific hiring preference for "hot, white, blonde chicks." Pl.'s Judgment Opp'n, Exhibit ("Ex.") 2 (Transcript of Jury Trial, Jan. 5, 2016) at 232:3–24. Similarly, former Redline manager Jon Calvert testified that Dadlani "stated that he wanted hot, blonde chicks or hot, blonde, white chicks." Id. at 352:18–19. Gifford also testified that during one particular round of hiring for new

tion for a new trial] ("Defs.' New Trial Reply"); (10) the defendants' Memorandum of Points and Authorities in Support of the Defendants' Motion, in the Alternative, for Remittitur ("Defs.' Remittitur Mem."); (11) the

plaintiff's Opposition to [the] Defendants' Motion for Remittitur ("Pl.'s Remittitur Opp'n"); and (12) the Defendants' Reply to [the] Plaintiff's Opposition to the Motion for Remittitur ("Defs.' Remittitur Reply").

wait staff, Dadlani stated that "[h]e was pretty upset and felt like [Redline managers] set him up with nothing but African American applicants." Id. at 234:19–20. Furthermore, both managers explained that Makesha Wade, an African American bartender that the managers intended to hire, was rejected by Dadlani because she did not have the right "look." Id. at 235:23–236:2; id. at 359:8. Calvert further testified that he "told [Dadlani] that [he] believe[d] that [Dadlani] was discriminating against [Wade] because she was black," to which Dadlani purportedly responded "so turn me in." Id. at 359:14–18. Where, as here, "the plaintiff offers direct evidence of discriminatory intent, that evidence will 'generally entitle a plaintiff to a jury trial.'" Ayissi–Etoh v. Fannie Mae, 712 F.3d 572, 576 (D.C. Cir. 2013) (quoting Vatel v. All. of Auto. Mfrs., 627 F.3d 1245, 1247 (D.C. Cir. 2011)); see also Wilson v. Cox, 753 F.3d 244, 247 (D.C. Cir. 2014) (finding that when the plaintiff offers "statements that constitute direct evidence of . . . discrimination," she is "entitl[ed] to proceed to trial"). Here, the evidence not only entitled the plaintiff to a jury trial, but also warranted a verdict in favor of the plaintiff. See Metrocare v. Wash. Metro. Area Transit Auth., 679 F.2d 922 (D.C. Cir. 1982) ("The four individual plaintiff employees have each presented enough specific facts to make their prima facie cases of discrimination; WMATA's evidence was either wholly unresponsive or, to the extent it articulated a reason for the employer's action, could be believed by the jury to be overborne. Under the stringent standard we are compelled to apply to jury verdicts, these verdicts of discrimination must stand as reasonable.").

The defendants nevertheless contend that judgment in their favor is appropriate because Sonia "Bel Hadj—the front of house manager at the time that [the] [p]laintiff was hired and terminated—[was]

at the heart of the decision to terminate the [p]laintiff. Yet there was no evidence that [ ] Bel Hadj acted with any discriminatory animus or was the vehicle for [ ] Dadlani's alleged discriminatory motivations." Defs.' Judgment Mem. at 6–7. This argument is baseless, as there was ample evidence in the record for the jury to conclude that it was Dadlani, not Bel Hadj, who was responsible for terminating the plaintiff. See, e.g., Pl.'s New Trial Opp'n, Ex. 7, (Transcript of Jury Trial, Jan. 13, 2016) at 214:19–20 (Bel Hadj testifying that Dadlani "asked [her] to send [the plaintiff] home"); id. at 232:17–19 (Bel Hadj answering affirmatively to the question as to whether "Mick Dadlani instructed [her] that [she] had to let [the plaintiff] go"); Pl.'s New Trial Opp'n, Ex. 1 (Transcript of Jury Trial, Jan. 7, 2016) at 85:22–86:1 (the plaintiff testifying about Bel Hadj's demeanor when she was terminated, noting that Bel Hadj "just kept saying you have to leave. You have to leave. You should leave . . . . And she kept saying [Dadlani], the owner, you have to leave."). More importantly, the defendants' position is directly contradicted by their own assertions in their motion for judgment as a matter of law that "[i]t [is] undisputed that [ ] Dadlani made the decision to terminate [the] [p]laintiff." Defs.' Judgment Mem. at 1. Accordingly, the Court must conclude that the defendants' motion for judgment as a matter of law must be denied with respect to the defendants' employment discrimination liability.

### B. The Judgment as a Matter of Law with Respect to Punitive Damages

 Similarly, the evidence presented was sufficient to permit a jury to award punitive damages against the defendants. Under District of Columbia law, "in order to sustain an award of punitive damages,

the plaintiff must prove, by a preponderance of the evidence, that the defendant committed a tortious act, and by clear and convincing evidence that the act was accompanied by conduct and a state of mind evincing malice or its equivalent." Jonathan Woodner Co. v. Breeden, 665 A.2d 929, 938 (D.C. 1995). And under federal law, punitive damages are available where "the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." Kolstad v. Am. Dental Ass'n, 527 U.S. 526, 534, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999) (citation omitted). Specifically, "an employer must at least discriminate in the face of a perceived risk that [his or] its actions will violate federal law to be liable in punitive damages." Id. at 536, 119 S.Ct. 2118.

█ Not only did the plaintiff submit evidence of blatant and pervasive discrimination on the part of Dadlani, but there were several instances where he was specifically warned of the discriminatory nature of his actions to no avail. As previously noted, when Calvert informed Dadlani that rejecting Wade's application for employment was discriminatory, he responded "so turn me in." Pl.'s Judgment Opp'n, Ex. 2 (Transcript of Jury Trial, Jan. 5, 2016) at 359:14–18.[4] In addition, testimony elicited by the plaintiff indicated that Dadlani implemented a requirement that applicants submit photographs with their resumes because he "stated that he wanted to see what the applicants looked like." Id.

at 346:16–17. In response to this demand, Calvert informed Dadlani that he "thought that that could be construed as discriminatory using the materials for the purpose of discrimination," to which Dadlani stated that "he wasn't concerned." Id. at 348:13–19. And after Dadlani announced his intention to hire "hot, white, blonde chicks," Calvert informed him more than once "[t]hat that was blatant discrimination and that it was illegal." Id. at 353:24–354:3, 354:11–13. Calvert, as noted earlier, testified that Dadlani responded "that he wasn't concerned about it," and "[a]t one point he said so turn me in." Id. at 354:4–8. As this Circuit has explained, "[a]n employee's right to employment free from racial discrimination is one of the most widely recognized and protected civil rights," Barbour v. Merrill, 48 F.3d 1270, 1277 (D.C. Cir. 1995), and Dadlani's reactions to Calvert's warnings were sufficient for the jury to conclude that Dadlani exhibited the requisite mental state for punitive damages under both District of Columbia and federal law. Accordingly, the Court must conclude that the defendants' motion for judgment as a matter of law must also be denied with respect to the jury's punitive damages award.

## II. The Defendants' Motion for a New Trial Pursuant to Rule 59(a)

In their second post-trial motion, the defendants contend that they deserve a new trial "because the evidence that [the plaintiff was] permitted to present ... unfairly prejudiced the [d]efendants by inflaming the passions of the jury ..., lead-

---

4. The defendants argue that there was "no evidence that [ ] Calvert had any particular expertise, training or knowledge about discrimination law or that [ ] Dadlani relied on [ ] Calvert for that information." Defs.' Judgment Mem. at 40. This contention is of no moment, as neither of the cases the defendants cite suggests any requirement that a

defendant be warned specifically by someone with expertise in employment law. See Bogle v. McClure, 332 F.3d 1347, 1360 (11th Cir. 2003) (making no mention of any such requirement); Gibbons v. Bond, 523 F.Supp. 843, 854 (W.D. Mo. 1981) (same). In any event, it does not take an expert to recognize blatant discrimination.

ing the jury to issue a verdict ... motivated by passion and emotion, rather than reason." Defs.' New Trial Mem. at 1. Further, the defendants move for a new trial because they were "not permitted to introduce evidence that would have impeached the [p]laintiff and her witnesses, demonstrated that there was no discriminatory environment at Redline, and that [the defendants] made racially diverse hiring choices." Id. Finally, the defendants allege that they are entitled to a new trial regarding punitive damages "because the [p]laintiff was permitted to introduce evidence of [ ] Dadlani's 2014 income and net worth well before the time of trial." Id.

 Under Rule 59 of the Federal Rules of Civil Procedure, "[t]he court may ... grant a new trial on all or some of the issues ... after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a). Another member of this Court has specifically found that "[a] new trial should be granted 'only where the court is convinced the jury verdict was a seriously erroneous result and where denial of the motion will result in a clear miscarriage of justice.'" Lloyd v. Ashcroft, 208 F.Supp.2d 8, 13 (D.D.C. 2002) (quoting Nyman v. FDIC, 967 F.Supp. 1562, 1569 (D.D.C. 1997) (internal citations omitted)). Therefore, to be entitled to such relief, motions for a new trial "must clearly establish either a manifest error of law or fact or must present newly discovered evidence." Nyman, 967 F.Supp. at 1569 (quoting FDIC v. Meyer, 781 F.2d 1260, 1268 (7th Cir. 1986) (internal citations omitted)). However, "[motions for new trial] cannot be used to raise arguments which could, and should, have been made before the judgment [was] issued." Id. In addition, when deciding whether to grant a new trial, "the court should be mindful of the jury's special function in our legal system and hesitate to disturb its finding." Id. (citations omitted). "Accordingly, 'the standard for granting a new trial is not whether minor evidentiary errors were made in the course of a long trial, but rather whether there was a clear miscarriage of justice.'" Warren v. Thompson, 224 F.R.D. 236, 239 (D.D.C. 2004) (citation omitted). Additionally, "[t]he decision whether to grant a motion for a new trial is ordinarily 'entrusted to the sound discretion of the trial court.'" McNeal v. Hi–Lo Powered Scaffolding, Inc., 836 F.2d 637, 646 (D.C. Cir. 1988) (citation omitted).

### A. Challenges to the Admission of Evidence Presented by the Plaintiff

### i. The Testimony of Jon Calvert and Sean O'Neil

 The defendants first claim that they deserve a new trial because it was "reversible error" to allow Jon Calvert and Sean O'Neil to testify "that they believed [ ] Dadlani discriminated against African Americans." Defs.' New Trial Mem. at 3. The defendants contend that the plaintiff violated a pretrial "commitment not to elicit testimony about any witnesses' lay opinion about [ ] Dadlani's motivations," id. at 4, a commitment that purportedly prompted the Court to find as moot the defendants' motion in limine to exclude this testimony, id.

These statements were admissible, not as lay opinion testimony, but as evidence rebutting the defendants' position that the managers were biased against the defendants. The defendants noted in their opening statement that "former employees and former managers ... each ... ha[d] a reason to be biased against [ ] Dadlani." Pl.'s New Trial Opp'n, Ex. 1 (Transcript of Jury Trial, Jan. 4, 2016) at 35:4–9; 41:12–22. The defendants went on to explain that

these managers "were involved at the beginning of Redline in its construction phase, but they never made it to the grand opening. Redline was a big opportunity for them and it got taken away from them. And the evidence is going to show that they weren't happy about that." Id. at 41:25–42:5. Thus, at issue in this case was the witnesses' motivations for terminating their employment relationship with Redline, and the challenged testimony explained that they departed because they felt the defendant was engaging in racist hiring and related practices. The Court's prior pretrial rulings that Jeremy Gifford could not testify that "he believed that [ ] Dadlani was discriminating against black people," Defs.' New Trial Mem. at 5, is not inconsistent. This ruling would not have precluded Gifford from testifying that, similar to the other managers, he left employment at Redline because he thought the defendants were engaging in discriminatory practices.

█ The plaintiff did not need to wait until the witnesses were cross-examined about their alleged bias because this purported bias was raised both pretrial and during the defendants' opening statement. The doctrine of "curative admissibility" allows a party to elicit "testimony not admissible on direct, on the ground that the other party has opened the doors" to such testimony. United States v. Winston, 447 F.2d 1236, 1240 (D.C. Cir. 1971). Here, Calvert and O'Neil's testimony regarding why they left Redline was appropriate to defeat the defendants' position that Calvert and O'Neil were biased against Dadlani. Accordingly, in reasonable anticipation of the attack on their purported bias, the plaintiff could attempt to take the sting out of the anticipated attack by addressing the matter in the opening statement and on direct examination.

The defendants' remaining challenges to the admissibility of this testimony fail because the probative nature of the evidence was not outweighed by any unfair prejudice. Indeed, the managers' purported bias was a central element of the defendants' theory of the case, and it would have been error for the Court to preclude evidence rebutting that purported bias. The defendants' contend that "the relevance of Mr. O'Neil's testimony about why he resigned from Redline in May 2011 was dramatically undermined due to the fact that Mr. O'Neil had no reliable, first hand knowledge of any facts that led or contributed to his opinion that [ ] Dadlani was discriminating against black patrons." Defs.' New Trial Mem. at 9. But this assertion is meritless because it is factually inaccurate; O'Neil specifically testified about Dadlani's comments on the night a fake guest list was purportedly used to keep out African Americans. See Pl.'s New Trial Opp'n, Ex. 3 (Transcript of Jury Trial, Jan. 7, 2016) at 728:20–24. Accordingly, the Court must conclude that it did not err when it permitted this testimony.

### ii. The Admission of Tara Wyman's Job Application

█ The defendants next move for a new trial because they claim that it was error for the Court to admit into evidence Tara Wyman's job application that contained a handwritten notation with the words "blond girl" at the top. Defs.' New Trial Mem. at 10–11. Specifically, the defendants argue that the application was not properly authenticated, and that the plaintiff failed to "show who made the [blond girl] note." Id. at 11. To authenticate a document, a party must "produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901; see also United States v. Safavian, 435 F.Supp.2d 36, 38 (D.D.C. 2006) ("The threshold for the

Court's determination of [Rule 901] authenticity is not high."). A "document can be authenticated ... by a witness who wrote it, signed it, used it, or saw others do so." United States v. Landron–Class, 696 F.3d 62, 69 (1st Cir. 2012) (first quoting Orr v. Bank of Am., NT & SA, 285 F.3d 764, 774 n.8 (9th Cir. 2002); then quoting 31 Charles Alan Wright & Victor J. Gold, Federal Practice & Procedure: Evidence § 7106 (2000)). Wyman testified that the application was hers, that she completed and signed the application, and that she did not write the "blond girl" notation on the application. See Pl.'s New Trial Opp'n, Ex. 4 (Transcript of Jury Trial, Jan. 6, 2016) at 633:6–634:4. Furthermore, the fact that the defendants produced the document during discovery speaks to its authenticity. See Lexington Ins. Co. v. W. Pa. Hosp., 423 F.3d 318, 329 (3d Cir. 2005) (finding that a document produced by an opposing party pursuant to discovery requests is "circumstantial evidence of the authenticity of the document"). Therefore, the Court here properly concluded that Wyman adequately authenticated the document prior to its admission into evidence.

■■ The defendants' argument that the document should not have been admitted because the plaintiff did not show who made the "blond girl" notation also fails. "The Court need not find that the evidence is necessarily what the proponent claims, but only that there is sufficient evidence that the jury ultimately might do so." Safavian, 435 F.Supp.2d at 38. The application was in the defendants' possession after Wyman submitted it and there was ample evidence that Dadlani said he wanted to hire blonde girls. This was sufficient for the jury to reasonably infer that defendant Dadlani, or someone employed by Redline and involved in the hiring process, was responsible for putting the notation on the application. And the fact that the author of the "handwritten notations remains unknown" does not extinguish the document's authenticity. Lexington, 423 F.3d at 329. The evidence was therefore admissible, and the jury could give it the weight it thought was appropriate. See United States v. Murdock, 699 F.3d 665, 670 (1st Cir. 2012) ("If the court discerns enough support in the record to warrant a reasonable person in determining that the evidence is what it purports to be, then Rule 901(a) is satisfied and the weight to be given to the evidence is left to the jury." (quoting United States v. Paulino, 13 F.3d 20, 23 (1st Cir. 1994))).

### iii. Evidence that Dadlani Sought Attractive Candidates

■ The defendants contend that a new trial is warranted because the plaintiff "elicited testimony that ... Dadlani tasked Fabrice Reymond with looking up an applicant on Facebook and inviting her in for an interview 'if she looks good.'" Defs.' New Trial Mem. at 21. According to the defendants, the plaintiff argued that this was "evidence of [defendant] Dadlani's discriminatory practice," but that there was "no evidence that it had anything to do with race." Id. In light of the evidence that Dadlani had indicated a preference for hiring white women, see, e.g., Pl.'s New Trial Opp'n, Ex. 2 (Transcript of Jury Trial, Jan. 5, 2016) at 352:7–25 ("He stated he wanted hot, blonde chicks, or hot, blonde, white chicks."), it was reasonable for the plaintiff to suggest that Dadlani was referring to race when he instructed Reymond to interview a candidate "if she looks good." It then became an issue for the jury to assess—whether Dadlani was referencing a preference for hiring white women or merely a preference for hiring attractive candidates of any race. And there was sufficient evidence in the record to support

the inference that Dadlani was referring to race when he made the statement.

### iv. Evidence of Discriminatory Animus Towards Patrons

The defendants next assert that the Court erred by allowing the plaintiff to present evidence that "Dadlani discriminated against patrons at Redline, as evidence of discrimination against employees" and employment candidates. Defs.' New Trial Mem. at 25. Specifically, the defendants claim that evidence of racial bias toward Redline patrons was inadmissible because these patrons were not similarly situated to the plaintiff, and that the fake guest list was not used to exclude African Americans from Redline. Id. at 26–28.

The evidence presented by the plaintiffs was relevant and admissible because it established Dadlani's discriminatory animus towards African Americans at Redline. Indeed, "[i]t defies common sense to say ... that evidence of an employer's discriminatory treatment of black customers might not have some bearing on the question of the same employer's motive in discharging a black employee." Estes v. Dick Smith Ford, Inc., 856 F.2d 1097, 1104 (8th Cir. 1988), overruled in part on other grounds by Price Waterhouse v. Hopkins, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989); see also Betts v. Costco Wholesale Corp., 558 F.3d 461, 470 (6th Cir. 2009) ("The racial hostility was further evidenced ... by [the employer's] less-than-favorable treatment of its black customers."); Barber v. Cty. of Ventura, 45 Fed. Appx. 725, 729 (9th Cir. 2002) ("The customer's testimony is relevant because it shows how the [employer] treated [the plaintiff] and other members of his race.

That the customer was not an employee does not bar her testimony."); Greene v. Coach, Inc., 218 F.Supp.2d 404, 411 n.9 (S.D.N.Y. 2002) ("[T]estimony that African-American employees and customers were treated differently ... is relevant to proving [the plaintiff's] specific claim of intentional discrimination."). This form of evidence was particularly probative in this case because testimony at trial indicated that Dadlani's purported aversion to African American staff was directly related to his desire to avoid African American patronage. See Transcript of Jury Trial, Jan. 5, 2016 at 254:16–20 ("Q: You also indicated that Mr. Dadlani told you that he didn't want Redline to be like Clyde's because you say that Clyde's had a predominately black patronage on Sunday nights; is that right? A: Correct."); id. at 299:3–8 ("The conversation was about ... why Hooters is more of a blue collar crowd versus the white collar crowd became why also do they have a majority African American [wait] staff versus some of the other places down here. And he said, I don't want to be like Hooters.").[5]

The cases cited by the defendants are inapposite, as they consider the admissibility of "me too" evidence proffered by other employees. These prior bad acts of discrimination against other employees are sometimes "admissible under Rule 404(b) to prove intent or motive to retaliate," Hayes v. Sebelius, 806 F.Supp.2d 141, 144 (D.D.C. 2011) (first citing Goldsmith v. Bagby Elevator Co., 513 F.3d 1261, 1286 (11th Cir. 2008); then citing Buckley v. Mukasey, 538 F.3d 306, 319 (4th Cir. 2008)), and admissibility turns on the Court's inquiry of "the facts of a given case and how closely related the evidence

5. Dadlani's stated views about the relationship between the racial composition of a bar's patronage and the staff that serves them is one reason why this evidence was relevant and admissible in this case, but evidence of Dadlani's prior hiring decisions while working in the investment industry, discussed in further detail infra, was not.

is to the plaintiff's circumstances and theory of the case," id. (citing Nuskey v. Hochberg, 723 F.Supp.2d 229, 233 (D.D.C. 2010)). But these cases are inapposite because the Court is not addressing "me too" evidence, but instead the relevance and admissibility of Dadlani's purported views regarding the relationship between the racial composition of Redline's customers and its wait staff. In sum, the Court's evidentiary rulings with respect to Dadlani's treatment of African American patrons did not constitute error.

### v. Hand Shake Evidence

The defendants next contend that it was error to allow testimony indicating that Dadlani had shaken white bartenders' hands but refused to shake the plaintiff's hand. Defs.' New Trial Mem. at 30–31. The defendants specifically argue that these two situations were "too dissimilar to draw a meaningful comparison" and could be "equally attributable" to non-discriminatory factors. Id. at 31–32. However, this evidence was relevant as just another piece of evidence of Dadlani's negative treatment of African American employees at Redline. Any dissimilarities between the circumstances under which Dadlani shook the hands of other employees was for the jury to consider with respect to the weight to accord this evidence.

### B. Evidence Precluded Due to Discovery Violations

#### i. Evidence of Bartenders Hired After July 2011

The defendants contend that it was error for the Court to prohibit them from eliciting testimony about African American bartenders who were purportedly hired by Redline after July 2011, and for instructing the jury "to disregard [testimony regarding] the bartenders that Mr. Reymond had listed during his trial testimony."

Defs.' New Trial Mem. at 13. The Court's rulings were necessary to remedy the defendants' egregious and multiple discovery violations.

During discovery, the plaintiff issued discovery requests asking the defendants to "identify their bartenders by name and race." Pl.'s New Trial Opp'n at 28; see also Pl.'s New Trial Opp'n, Ex. 11 (Plaintiff's First Set of Interrogatories) at 6–7. In their response, the defendants represented that they did not keep records of their employees' race and could not "speculate" as to the race of any Redline employee. Pl.'s New Trial Opp'n, Ex. 12 (Defendants' Third Supplemental Answers to Plaintiff's Interrogatories) at 3. In addition, the defendants objected to the request as "unduly burdensome" and "not related to the period of time in which the employment decisions concerning [the] [p]laintiff were made." Pl.'s New Trial Opp'n at 29 (citations omitted). Ultimately, the "[d]efendants agreed to provide only the names of the employees who worked at Redline from June 2010 to June 2011." Id. In spite of the defendants' assertions that they could not speculate as to the race of an employee, and that the identities of those employees who worked for Redline after June 2011 were not relevant, the defendants acted as follows:

> In preparation for trial, Reymond reviewed employee records and created a list of employees who were purportedly African American. (The very exercise [the] [d]efendants said they were unable to do in 2012). The list included the names of no less than [twenty-five] individuals that [the] [p]laintiff had never seen or heard before .... [T]he list consisted almost exclusively of employees who purportedly worked at Redline well after June 2011. In other words, the list contained the information that [the] [d]efendants previously represented

they did not have, was not relevant to [the] [p]laintiff's case, or would be too burdensome for them to compile. During trial, [the] [d]efendants then provided Reymond with the list to assist him in identifying black bartenders who worked at Redline after the Grand Opening.

Id. at 29 (citations omitted). And pursuant to Federal Rule of Civil Procedure 37(c), the Court found that it was necessary to preclude information specifically requested by the plaintiff during discovery but that the defendant failed or otherwise refused to produce. See Fed. R. Civ. P. 37(c) ("If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.").

█ The defendants assert that the plaintiff "waived [her] objection to [ ] Reymond's testimony about the . . . bartenders" by not objecting to the defendants' questions until "well after [ ] Reymond had testified about the five bartenders that he could remember without the benefit of his list." Defs.' New Trial Mem. at 13–14. The plaintiff did not object to the question—"whether Redline employed black bartenders after the 2010 Grand Opening"—but to Reymond's answer. Pl.'s New Trial Opp'n at 30. The plaintiff notes that her counsel objected (a) while he was still on the witness stand; (b) within minutes of the question (if not less); (c) as he was completing his answer to the question; (d) before he testified to any additional undisclosed information; and (e) in sufficient time for the Court to remedy the violation.

Id. In all respects, the plaintiff's objection was timely.

█ The defendants further assert that the plaintiff "waived her ability to object to [the] [d]efendants' evidence that

Redline hired black bartenders after July 2011 because she made broad assertions, during her opening argument, about the lack of black bartenders at Redline, and because she elicited the same testimony from Tara Wyman." Defs.' New Trial Mem. at 14. Both arguments fail. The plaintiff's opening statement limited her assertions as to the racial composition of Redline's wait staff specifically to those who worked there "at the time Ms. Hardin was fired." Pl.'s New Trial Opp'n, Ex. 1 (Transcript of Jury Trial, Jan. 4, 2016) at 28:13–17. Indeed, the Court specifically addressed this point during trial, stating that the plaintiff "never said that there were never black bartenders" in her opening statement. Pl.'s New Trial Opp'n, Ex. 10 (Transcript of Jury Trial, Jan. 8, 2016) at 20:12–17. And with respect to Tara Wyman's testimony that was presented through the use of her deposition, she stated that "[d]uring the period that [she] worked at Redline, between the fall of 2010 and August 2012," there were no other African American bartenders that worked there. Pl.'s New Trial Opp'n, Ex. 4 (Transcript of Jury Trial, Jan. 6, 2016) at 636:19–25. Therefore, as the plaintiff states in her opposition, "[i]f [the] [d]efendants' true intention in eliciting the undisclosed information was to counter Wyman's claim, they would have only sought to introduce evidence regarding black bartenders who worked with Tara Wyman, before she left Redline in August 2012," instead of identifying "a number of individuals who worked long after Wyman left Redline, including at least one person who [the] [d]efendants hired in 2016." Pl.'s New Trial Opp'n at 31 (citing Pl.'s New Trial Opp'n, Ex. 3 (Transcript of Jury Trial, Jan. 7, 2016) at 864:9–12).

### ii. The Court's Instruction Regarding Thacha Thanarat

█ The defendants argue that the Court's instruction to the jury to disregard

Reymond's testimony that he considered Thacha Thanarat to be African American was inappropriate. Defs.' New Trial Mem. at 18. The defendants specifically argue that this sanction was improper because the plaintiff "did not seek [a motion] to compel [the] [d]efendant[s] to identify the race of the listed bartenders." Id. This assertion is inaccurate and misleading.

The plaintiff requested information during discovery "regarding the race of [Redline's] employees[,]" see Pl.'s New Trial Opp'n, Ex. 11 (Plaintiff's First Set of Interrogatories) at 6–7, to which the defendants responded that they did not have information "regarding the race of [their] employees" and could not "speculate" as to the race of any employee, see Pl.'s New Trial Opp'n, Ex. 12 (Defendants' Third Supplemental Answers to Plaintiff's Interrogatories) at 3. If Reymond, as the designated representative of Redline, subsequently developed the ability to provide information about the race of each employee, the defendants had an obligation to supplement their discovery responses accordingly, see Fed. R. Civ. P. 26(e)(1), and their failure to do so required the Court to preclude this information, see Fed. R. Civ. P. 37(c)(1); see also, e.g., Norden v. Samper, 544 F.Supp.2d 43, 49–50 (D.D.C. 2008) (" 'Rule 37(c)(1) is a self-executing sanction, and the motive or reason for the failure is irrelevant. It therefore is unnecessary to decide whether the [plaintiff] acted in bad faith … or was simply sloppy in its search for relevant documents and in assisting its litigation counsel in responding to interrogatories.' 'The overwhelming weight of authority is that preclusion is required and mandatory absent some unusual or extenuating circumstances-that is, a 'substantial justification.' " (quoting Elion v. Jackson, No. 05–0992, 2006 WL 2583694, at *1–2 (D.D.C. Sept. 8, 2006))).

■ The defendants further contend that the instruction regarding Thanarat given to the jury "as part of the sanction was inaccurate." Defs.' New Trial Mem. at 18–19. The defendants, however, waived any objection to the limiting instruction regarding Thanarat by consenting to it. See Pl.'s New Trial Opp'n, Ex. 10 (Transcript of Jury Trial, Jan. 8, 2016) at 30:2–23 ("We concede the instruction."). However, even if they had not consented, the instruction was accurate to the extent that all witness depositions referencing Thanarat described him as Asian, and the defendants themselves identified him as an "Asian male" in their pretrial statement. Pl.'s New Trial Opp'n at 34 (citing Joint Pretrial Statement, Addendum of Objections at 313–14 (Aug. 31, 2015), ECF No. 124–13).

### iii. Testimony Regarding Salah Benbaba

■ The defendants next claim that the Court erred by instructing the jury to disregard Reymond's testimony that "Salah Benbaba, who is black, worked as a host on the night of the Grand Opening." Defs.' New Trial Mem. at 22. The Court sustained the plaintiff's objection to this testimony on the grounds that Benbaba had never previously been identified as a host. Id.; see also Pl.'s New Trial Opp'n, Ex. 3 (Transcript of Jury Trial, Jan. 7, 2016) at 863:21–864:4. The defendants never disclosed that Benbaba worked as a host, despite the plaintiff's discovery request regarding Benbaba's employment at Redline. See Pl.'s New Trial Opp'n, Ex. 11, (Plaintiff's First Set of Interrogatories) at 7. Additionally, the defendants' vague reference that "Benbaba … worked in a variety of positions" at Redline, see Defs.' New Trial Mem., Ex. 12 (Defendants' Fourth Supplemental Answers to Plaintiff's Interrogatories) at 3, could not have put the plaintiff "on clear notice" that Ben-

baba would be described as working as a host on the night of the grand opening. Defs.' New Trial Mem. at 23. Accordingly, the Court appropriately instructed the jury to disregard the testimony indicating that Benbaba worked as a host on the night of the grand opening, while permitting it to consider that he worked as a security guard, which was the position the defendants represented that he held by way of discovery.

## C. Challenges to the Preclusion of Defendants' Other Evidence

### i. Evidence of Dadlani's Hiring Practices Outside of Redline

 The defendants argue that it was error for the Court to exclude evidence that "Dadlani hired African Americans" at Smith Barney, which they contend was "relevant to show that [he] did not have a general animus toward African Americans." Defs.' New Trial Mem. at 19–20.

This evidence was not relevant. Here, the plaintiff's claim was that Dadlani engaged in a particular type of discrimination as it related to people who would have interactions with the patrons at Redline, and the plaintiff's evidence was that the defendant desired a certain racial composition for the Redline wait staff in order to draw a certain race of patrons. Smith Barney is involved in an entirely different industry and business focus than that of Redline, and it is unclear how Dadlani's hiring activity in the investment industry was relevant to the case at hand. Moreover, the fact that Dadlani hired and worked with one African American at his investment firm seven years prior to the events at issue in this case, see Defs.' New Trial Reply at 13 ("[T]he employee was hired in 1999 and worked with him through 2003, so only seven years had passed), further extinguishes the probative

value of this testimony, cf. Hayes, 806 F.Supp.2d at 144–45 (noting that one of the factors the court must consider, at least with respect to "me too" evidence, is whether the prior behavior "is close in time to the events at issue in the case").

### ii. Lay Opinion Testimony by Gifford

 The defendants assert that the Court erroneously prohibited Gifford from being questioned about his prior statement "that he believed that . . . [if defendant] Dadlani . . . had a specific bias against hiring [African Americans, then defendant] Dadlani would have told him so directly." Defs.' New Trial Mem. at 23–24; see also Pl.'s New Trial Opp'n, Ex. 2 (Transcript of Jury Trial, Jan. 5, 2016) at 290:8–291:9. The defendants argue specifically that they should have been allowed to elicit such testimony to rebut "the inference that [use of the word] 'look' meant 'race'" when defendant Dadlani told Gifford that Wade did not have the right "look" to work at Redline. Defs.' New Trial Mem. at 24. Regardless of the defendants' intentions regarding the desired use of this testimony, the testimony must first comport with the Federal Rules of Evidence before being admitted, and Gifford's testimony would have called for impermissible speculation. See Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."). To answer the defendants' question, Gifford would have needed to engage in speculation, and his answer was therefore inadmissible.

### iii. Purportedly False Allegations in the Plaintiff's Complaint

 The defendants claim that the Court erred when it prohibited them from "asking [the] plaintiff about the exaggerated and false allegations that she included in her . . . Original and Amended com-

plaint." Defs.' New Trial Mem. at 32. The defendants point to an assertion in the plaintiff's complaint alleging that Dadlani prohibited his Hispanic employees from using the bathroom "lest they be visible on the floor to patrons" and that "at least one ... employee was fired ... because he came out of the kitchen." Defs.' New Trial Mem., Ex. 13 (Plaintiff's Amended Complaint) ¶ 28. "This allegation was derived from a conversation [the] plaintiff had with someone who claimed to have been a former Redline employee, who worked in the kitchen, and who was fired for leaving the kitchen during work." Defs.' New Trial Mem. at 33; see also Defs.' New Trial Mem., Ex. 14 (Hardin Deposition) at 432:4–433:9. The defendants sought to impeach the plaintiff using her deposition testimony that the "alleged former employee did not [indicate] that kitchen workers had been prohibited from using the restroom" or had to wait to use the restroom so patrons would not see them. Defs.' New Trial Mem. at 33.

The defendants' arguments are meritless because the allegations in the Amended Complaint are not directly attributable to the plaintiff's own assertions and could not be used to impeach her. The defendants themselves concede that this specific allegation "was derived from a conversation [the] plaintiff had with someone who claimed to have been a former Redline employee" whose employment at Redline was terminated. Defs.' New Trial Mem. at 33. Impeaching the plaintiff with these statements would have been improper because the allegations at issue in the plaintiff's Amended Complaint were derived from other sources not properly attributable to the plaintiff, and also because it was the plaintiff's attorneys, and not the plaintiff herself, who signed the Amended Complaint. Cf. Vehicle Mkt. Research, Inc. v. Mitchell Int'l, Inc., 767 F.3d 987, 994 n.4 (10th Cir. 2014) ("The assertion in the complaint was not even made by [the plaintiff]—it was made by counsel in an unverified complaint."); Kelley v. Eli Lilly & Co., 517 F.Supp.2d 99, 104 (D.D.C. 2007) ("[A]llegations in an unverified complaint are not accorded any evidentiary weight in determining if there is a genuine issue of material fact under Rule 56.").

### iv. The Plaintiff's Reaction to Her Boyfriend's Redline Visit

■ The defendants next contend that it was prejudicial to prevent them from questioning the plaintiff "about her reaction to learning that her boyfriend, Theodore Allen, patronized Redline a few months after she was allegedly terminated." Defs.' New Trial Mem. at 34. But as the Court explained at trial, someone's significant other is "an independent person." Pl.'s New Trial Opp'n, Ex. 2 (Transcript of Jury Trial, Jan. 5, 2016) at 191:9. While a reaction exhibited by the plaintiff to her boyfriend's patronage of Redline "may have some reflection on the nature of the relationship between her and her boyfriend," it does not have "an impact on whether she felt traumatized by what happened to her." Id. at 191:24–192:2.

Moreover, counsel for the defendants conceded at trial that they did not even have a good-faith basis to believe that Allen actually ever told the plaintiff that he had been to Redline, id. at 192:16–19, and did not "know what she [was] going to say" in response to this line of questioning, id. at 189:12–14. Therefore, this testimony was properly excluded, as any probative value would have been substantially outweighed by the dangers of confusing the issues for the jury to address, misleading the jury, causing undue delay, and wasting time. See Fed. R. Evid. 403.

[Editor's Note: Redacted by court.]

**D. The Suggestion that Bel Hadj was Responsible for the Plaintiff's Termination**

 The defendants next request a new trial because "it was Ms. Bel Hadj[, not Dadlani,] who took the employment actions that resulted in [the plaintiff's] separation from Redline" and that "there was no evidence that [ ] Bel Hadj discriminated against [the plaintiff]." Defs.' New Trial Mem. at 10. Therefore, according to the defendants, absent any evidence that Bel Hadj "bore discriminatory animus toward [the] plaintiff or acted as the tool of [ ] Dadlani's discriminatory intent, it would be a miscarriage of justice to permit the jury verdict to stand." Id. The defendants argue that a "same-actor" inference applies and weighs against any presumption of discrimination because Bel Hadj supposedly hired and fired the plaintiff. See Marcelus v. CCA of Tenn., Inc., 691 F.Supp.2d 1, 8 (D.D.C. 2010) ("From the standpoint of the putative discriminator, it hardly makes sense to hire workers from a group one dislikes ..., only to fire them once they are on the job." (quoting Proud v. Stone, 945 F.2d 796, 797 (4th Cir. 1991))); see also Proud, 945 F.2d at 797 ("[I]n cases where the hirer and the firer are the same individual and the termination of employment occurs within a relatively short time span following the hiring, a strong inference exists that discrimination was not a determining factor for the [employer's] adverse action.").

This claim is baseless because, as discussed supra, there was ample evidence indicating that Dadlani, not Bel Hadj, terminated the plaintiff. See, e.g., Pl.'s New Trial Opp'n, Ex. 7 (Transcript of Jury Trial, Jan. 13, 2016) at 214:19–20; id. at 232:17–19; Pl.'s New Trial Opp'n, Ex. 1 (Transcript of Jury Trial, Jan. 7, 2016) at 85:22–86:1. And again, the defendants themselves state that "[i]t [is] undisputed that [ ] Dadlani made the decision to terminate [the] [p]laintiff." Defs.' Judgment Mem. at 1.

**E. Punitive Damages**

 The defendants also contend that they are entitled to a new trial regarding punitive damages because "the [p]laintiff elicited testimony from [Dadlani] that his income in 2014 was approximately $645,-000[,]," which was his "income at [the] time when he enjoyed having a very large salary ... [at] an international investment bank." Defs.' New Trial Mem. at 42. The defendants claim that "where a [d]efendant's net worth is at issue, only [his] ... net worth ... at the time of trial ... is relevant." Id. at 41. And they assert that at the time of trial, Dadlani "was not making enough revenue to cover the overhead charges ... passed onto him." Id. at 42.

The defendants' contentions lack merit because income evidence from several years prior to the date of trial is probative with respect to establishing a defendant's net worth. See Butera v. District of Columbia, 83 F.Supp.2d 25, 32 (D.D.C. 1999) (permitting "evidence of the [defendants]' gross incomes" during punitive damages phase of trial), aff'd in part, rev'd in part, 235 F.3d 637 (D.C. Cir. 2001); see also Arceneaux v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 767 F.2d 1498, 1503 (11th Cir. 1985) (affirming an award of punitive damages based upon the fact that the defendant "testified that his income for the past three years had been between $80,000 and $105,000," and that a jury "could well have found not credible that a person whose income was in the $90,000 per year range had a net worth of only $30,000." (citation omitted)); Bassi v. Patten, 592 F.Supp.2d 77, 85 (D.D.C. 2009) (denying a motion in limine to exclude the defendant's 2007 tax return in a trial scheduled to commence in January 2009

because "[e]vidence concerning a defendant's net worth is relevant to punitive damages." (citing <u>Breeden</u>, 665 A.2d at 941 & n.19 (D.C. 1995))). Thus, the defendants' assertions that the most recent income information does not accurately portray Dadlani's financial condition at the time of trial goes to the weight of this evidence, not its admissibility. See <u>Groobert v. President & Dirs. of Georgetown Coll.</u>, 219 F.Supp.2d 1, 9 (D.D.C. 2002) (noting that an expert witness's analysis of past income "goes to the weight of the evidence rather than its admissibility"). The defendants were permitted to—and did—introduce evidence purportedly demonstrating that Dadlani's financial circumstances had changed since receiving the income in question. See Pl.'s New Trial Opp'n at 40.

The defendants further argue that it was error for the plaintiff to introduce evidence that Dadlani spent "a substantial sum of money at a casino in the year before the trial occurred." Defs.' New Trial Mem. at 42–43. The defendants assert that evidence of whether Dadlani lost money gambling "was not relevant to the punitive damages award" and "had a substantial risk of unfair prejudice." <u>Id.</u> at 43. As a preliminary matter, the defendants waived these arguments by not raising them at trial, as their objection to this evidence was only that it would be "cumulative." See Pl.'s New Trial Opp'n, Ex. 25 (Transcript of Jury Trial, Jan. 21, 2016) at 612:1–618:15. Waiver aside, the plaintiff's questions regarding Dadlani's gambling expenses were admissible in order to impeach his direct testimony that his financial circumstances were unstable such that he needed to "live off of" his investment accounts because he "[did not] have any income [during the prior] year." Pl.'s New Trial Opp'n, Ex. 25 (Transcript of Jury Trial, Jan. 21, 2016) at 580:5–8.

## F. The Defendants' Request for a Continuance

The defendants allege it was error for the Court to deny their motion for a "continuance of the punitive damages phase of the trial so that they could produce documents ... showing [the defendants'] net worth at the time of trial." Defs.' New Trial Mem. at 43. The defendants claimed that their net worth had purportedly declined since the last iteration of financial documents they disclosed to the plaintiff prior to trial because "the stock market had suffered a significant decline prior to the commencement of trial, which persisted until the time the jury rendered its verdict." <u>Id.</u> at 44.

"The decision to continue [a case] ... lies in the sole discretion of the trial court." <u>Aruba Bonaire Curacao Trust Co. v. Comm'r</u>, 777 F.2d 38, 43 (D.C. Cir. 1985). Here, the defendants conceded that they were aware of the alleged change in Dadlani's financial status throughout the course of trial, but failed to disclose their intention to introduce new documents on the subject until the morning when the punitive damages phase was scheduled to begin. See Pl.'s New Trial Opp'n, Ex. 25 (Transcript of Jury Trial, Jan. 21, 2016) at 523:6–24. As the Court explained at trial, if the defendants sought to introduce updated financial documentation during the punitive damages phase, it was their obligation to produce that information to the plaintiff at the time it became available to them. See <u>id.</u> at 526:6–19. If that had occurred, it would have been incumbent on the plaintiff to request a continuance if her attorneys required additional time to respond to the new information. <u>Id.</u> In its discretion, the Court denied the motion as dilatory and prejudicial to the plaintiff. <u>Id.</u> at 533:3–11; 551:6–552:19. The Court reiterates its reasoning for denying the defendants' motion here, and the defendants'

motion fails to offer any new justification for the Court to disturb its prior ruling. Therefore, this argument does not warrant a new trial.

In sum, the defendants' motion for a new trial fails to assert a single instance whereby the Court committed error in its rulings. Moreover, even if any of the defendants' aforementioned arguments carried merit, the Court is of the view that no one particular ruling would have had a material impact on the outcome of the trial, or could be construed as a "clear miscarriage of justice." See Nyman, 967 F.Supp. at 1569. Evidence of discrimination and the defendants' requisite state of mind for punitive damages in this case was overwhelming, was offered by multiple independent sources, and was largely unrebutted by the defendants. Therefore, the Court must deny the defendants' motion for a new trial in its entirety.

## III. The Defendants' Motion for Remittitur

In the alternative to their motions for judgment as a matter of law and for a new trial, the defendants seek a remittitur of the damages award to the plaintiff pursuant to Federal Rule of Civil Procedure 59(e). Defs.' Remittitur Mot. at 1. Specifically, the defendants request "an order remitting the $687,000 verdict to a sum not to exceed as follows: (1) between thirty-thousand ($30,00) [sic] to fifty-thousand dollars ($50,000) for compensatory damages and (2) zero ($0) dollars for punitive damages." Id. The "[d]efendants assert that the $175,000 compensatory damages verdict and $512,000 in combined punitive damages is beyond all reason and shocks the conscience," and contend that "the punitive damages award should be remitted to zero because [the] [d]efendants['] financial circumstances preclude any award of punitive damages." Id. at 1–2.

"A court must be especially hesitant to disturb a jury's determination of damages in cases involving intangible and non-economic injuries." Langevine v. District of Columbia, 106 F.3d 1018, 1024 (D.C. Cir. 1997). Thus, remittitur pursuant to Rule 59(e) is necessary only "when (1) the verdict is beyond all reason, so as to shock the conscience, or (2) the verdict is so inordinately large as to obviously exceed the maximum limit of a reasonable range within which the jury may properly operate." Peyton v. DiMario, 287 F.3d 1121, 1126 (D.C. Cir. 2002). And "this circuit allows remittitur of jury verdicts only if the reduction 'permit[s] recovery of the highest amount the jury tolerably could have awarded.' " Langevine, 106 F.3d at 1024 (internal citation omitted).

### A. Remittitur of Compensatory Damages

With respect to compensatory damages, the defendants assert that the plaintiff's claims for emotional damages are of the "garden-variety," which the defendants characterize as those based upon "evidence of harm ... presented primarily through the testimony of the plaintiff, who describes ... her distress in vague or conclusory terms and fails to describe the severity or consequences of the injury." Defs.' Remittitur Mem. at 8 (quoting Rainone v. Potter, 388 F.Supp.2d 120, 122 (E.D.N.Y. 2005)). The defendants then proceed to cherry-pick jury verdicts from other discrimination cases for the sake of comparison, most of which are outside of this Circuit and all of which are more than ten years old. See Defs.' Remittitur Mem. at 9–15. But this Circuit has explicitly rejected the defendants' approach to remittitur, whereby a district court considers "cases ... for purposes of comparison in which lesser damages were awarded or

approved," Peyton, 287 F.3d at 1127, reasoning that:

> there is no way of obtaining uniformity in the amount juries and trial judges may award for damages in personal-injury cases. Because of the unique circumstances of each case as well as the adjustments which would necessarily have to be made for inflation, it is awkward to discuss the size of an award through comparison with past decisions,

id. (quoting Mariner v. Marsden, 610 P.2d 6, 16 (Wyo. 1980)). "Rather, the proper approach is to determine whether the judgment awarded, regardless of whether it is the statutory maximum, is supported by evidence, and does not shock the conscience, or is not inordinately large so as to be obviously unreasonable." Id. (citing Smith v. Nw. Fin. Acceptance, Inc., 129 F.3d 1408, 1416 (10th Cir. 1997).

Here, the record evidence is sufficient to support the jury's award for emotional damages of $175,000. As the plaintiff explains in her opposition:

> Multiple witnesses described [the plaintiff] as visibly "upset," "frantic," "balling," and "hyperventilating" immediately after she was fired. She was crying so hard she could hardly communicate. [The plaintiff] cried repeatedly after her termination and the experience continued to weigh on her as time passed, to the point where she often had to steal away to the bathroom at work to cry.
>
> As [the plaintiff] explained at trial, the pain of her experience at Redline has "stuck with [her]" and has continued to have a "strong effect" on her such that she does not think "it will ever go away." [The] [d]efendants' discriminatory conduct affects how [the plaintiff] performs on the job, impacts her ability to make new friends, and makes her constantly fear rejection and discrimination. [The plaintiff] made clear that [the] [d]efen-

dants' conduct still causes her substantial pain and "hurt[ ]" today.

Pl.'s Remittitur Opp'n at 9–10 (citations omitted). In light of this evidence, the jury's award neither "shocks the conscience" nor is "obviously unreasonable." See Peyton, 287 F.3d at 1127–28 (upholding damages award of $300,000 in a Section 1981 discrimination case where the plaintiff "presented convincing and credible evidence proving that her co-workers' and supervisors' conduct had a material effect upon her ability to perform and upon her quality of life in the workplace."); Ramseur v. Barreto, 213 F.R.D. 79, 84 (D.D.C. 2003) (upholding jury verdict of $300,000 in compensatory damages award for emotional distress based on denial of reassignment and receipt of a negative performance evaluation).

The defendants next contend that "there was uncontroverted evidence in the record of other facts in [the] [p]laintiff's life that contributed to her distress." Defs.' Remittitur Mem. at 16. But this argument asks the Court to usurp the role of the jury and weigh the evidence irrespective of the jury's conclusions. A "trial court may not substitute its judgment or credibility determinations for those of the jury," and "[the district court] abuses its discretion in ordering either a remittitur or new trial when the amount of the verdict turns upon conflicting evidence and the credibility of witnesses." Wallace v. FedEx Corp., 764 F.3d 571, 593 (6th Cir. 2014) (citations omitted); see also Langevine, 106 F.3d 1018, 1025 (D.C. Cir. 1997) ("[The district court] found that [it] had no good basis upon which to second-guess the jury, and [the Circuit] certainly ha[s] no basis to reject [its] judgment on an abuse of discretion standard of review.").

Lastly, the defendants contend that "[t]he apparent sympathy, passion[,] and prejudice at play during deliberations

are underscored by the jury's note asking whether they should consider attorneys' fees in determining the appropriate amount to award [the] plaintiff in the liability phase." Defs.' Remittitur Mem. 17. The defendants' assertion, however, is based entirely on speculation, as nothing in the jury's note could even remotely be considered a suggestion that the jury considered anything improper during their deliberations. Moreover, the Court specifically instructed the jury on the considerations that were permissible when determining an appropriate compensatory damages award, and absent a demonstration to the contrary, "[t]he jury is presumed to follow the instructions." United States v. Hall, 610 F.3d 727, 742 (D.C. Cir. 2010).

## B. Remittitur of Punitive Damages

The defendants also request complete remittitur of the punitive damages "because the undisputed evidence at trial was that both [defendants] had a negative net worth." Defs.' Remittitur Mem. at 18. Specifically, the defendants contend that "Dadlani testified that [ ] Redline was not making a profit, was unable to cover its financial responsibilities including its rent for the last three months and that it had received a notice from the landlord that Redline was in default of its lease." Id. at 19. The defendants also contend that they introduced a balance sheet which purportedly "indicate[d] that Redline's total assets as of that date were $263,061.39 and its total liabilities were $876,155.96, giving it a negative equity of over $613,000." Id. Similarly, the defendants state that Dadlani testified that at the time of trial, his assets were "$2,745,894 and his liabilities [were] [$]3,133,576, giving him a negative net worth of [$]387[,]682." Id. at 20–21.

As this Circuit has explained, "[i]t is true that an award of punitive damages should be related to the defendant's ability to pay," Hutchinson v. Stuckey, 952 F.2d 1418, 1422 n.4 (D.C. Cir. 1992) (citing Faison v. Nationwide Mortg. Corp., 839 F.2d 680, 691 (D.C. Cir. 1987), cert. denied, 488 U.S. 823, 109 S.Ct. 70, 102 L.Ed.2d 46 (1988)), but "the weight of authority places on the defendant the burden of producing evidence of his own financial condition if he wishes it considered by the jury," id. (citations omitted) (collecting cases). Here, the plaintiff explains that "the evidence [she] presented at trial . . . reflected a net worth for [ ] Dadlani of $679,352.54, and for Redline of $119,818.43." Pl.'s Remittitur Opp'n at 22; see also id. at 22–24 (itemizing values and record citations for each of Dadlani's assets and liabilities). Specifically with respect to Redline's net worth, the plaintiff draws attention to a discrepancy of $732,913 in the balance sheet that Dadlani could not explain on cross-examination, and that the defendants failed to otherwise address during the punitive damages phase of the trial. See id. at 24–25.[6] Ultimately, it was a question of fact for the jury to determine whether the defendants had the ability to pay the award that it ultimately imposed, a determination that required the weighing of evidence and the credibility of the witnesses. The Court's instructions specifically required the jurors to consider in determining any amount of punitive damages the defendants' "financial condition," and explained that any "amount [the jury] award[s] should not be in an amount that would bankrupt [ ] Dadlani or Redline." Transcript of Jury Trial, Jan. 21, 2016 at

---

**6.** The plaintiff identified a "'floating' line item reducing Redline's value by over $732,000 based on 'accumulated depreciation' that [was] not tied to any particular asset

.... [ ] Dadlani ultimately admitted that he 'can't explain' the $732,931 'floating' reduction in Redline's assets." Pl.'s Remittitur Opp'n at 24–25.

640:17–21 (Jan. 21, 2016). As previously noted, "[t]he jury is presumed to follow the instructions," Hall, 610 F.3d at 742, and the record evidence regarding the defendants' financial condition was sufficient for the jury to issue the punitive damages award. Blindly accepting the defendants' evidence that they each had a negative net worth, while ignoring the plaintiff's competing evidence of net worth in excess of the punitive damages award, would require the Court to usurp the jury's fact-finding role with respect to the defendants' financial circumstances.

 In their motion, the defendants attempt to bolster their argument with new record evidence never presented to the jury. For example, the defendants submit an affidavit from their accountant, Defs.' Remittitur Mot., Ex. 1 (Affidavit of Vijay Paul), and new financial statements for both defendants, Defs.' Remittitur Mot., Ex. 2 (updated financial statements). As the plaintiff articulates in her opposition, this information consists of

(1) entirely new evidence that [the] [d]efendants possessed during the punitive damages discovery period but never mentioned or produced to [the] [p]laintiff; (2) updated financial records for existing accounts [the] [d]efendants possessed weeks before the punitive damages phase but failed to disclose; (3) new testimony from witnesses that contradicts the testimony presented at trial; (4) assumptions that factual disputes at trial somehow had to be resolved in [the] [d]efendants' favor; and (5) evidence of new liabilities that did not even exist at the time of trial.

Pl.'s Remittitur Opp'n at 28. As previously explained, Rule 37(c) precludes requested information that a party fails to disclose in discovery or through supplemental disclosures. Fed. R. Civ. P. 37. And more importantly, "it would be inequitable to reduce the [d]efendants' liability for punitive damages on the basis of financial information which was available to them at trial," but not presented to the jury. Mason v. Okla. Tpk. Auth., 182 F.3d 1212, 1215 (10th Cir. 1999); see also Grabinski v. Blue Springs Ford Sales, Inc., 136 F.3d 565, 570 (8th Cir. 1998) ("[T]he defendants' failure to put on evidence of their net worth at trial constitutes a waiver."); Littlefield v. McGuffey, 954 F.2d 1337, 1349–50 (7th Cir. 1992) ("[H]ad the [defendants] wished the court to consider a lower figure based on net worth, they should have introduced this evidence at trial. We will not reward their failure to do so by reopening the proceedings at this stage." (citations omitted)). In sum, even if the Court were to consider the defendants' belated affidavits and supplemental evidence in addition to the evidence presented at trial, granting a remittitur would again require the Court to usurp the jury's fact-finding role regarding the defendants' financial condition.

Lastly, the defendants argue that "the Court should reduce the amount [of punitive damages] so that it is proportionate to the compensatory damages awarded at trial." Defs.' Remittitur Mem. at 23. The defendants explain that the United States Supreme Court has cautioned that "constitutional guarantees of due process 'prohibit[ ] the imposition of grossly excessive or arbitrary punishments on a tortfeasor,'" and that "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." Id. at 23–24 (quoting State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 416–17, 424–25, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003)). Here, the ratio of the awards for punitive damages to compensatory damages for Dadlani and Redline, respectively, are 2.86 and 0.06. These ratios do not exceed or even come close to "exceeding a

single-digit ratio." As the defendant offers no explanation or additional reasoning as to why the punitive damages award here may exceed what would be permitted by the Constitution, the Court must conclude that this argument fails.

## IV. CONCLUSION

For all of the reasons set forth above, all of the defendants' motions are denied.

**SO ORDERED** this 17th day of October.[7]

---

**7.** The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.